Filed 6/10/13

# CERTIFIED FOR PARTIAL PUBLICATION[*]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

|  |  |
|---|---|
| JULIUS CASTLE RESTAURANT INC., et al., Plaintiffs and Respondents, v. JAMES FREDERICK PAYNE et al., Defendants and Appellants. | A130955, A130957, and A131905 (San Francisco County Super. Ct. No. CGC-07-469795) |

The owner of a historic landmark restaurant property leased the premises to a corporation operated by two local restaurateurs. The restaurant closed after six months of operation and the parties filed lawsuits against each other. A jury ruled in favor of plaintiffs Julius Castle Restaurant, Inc. (JCRI), Charles Stinson, and John Bonjean on their claim of fraud. It also ruled in favor of defendants James Payne and Top of the Rock Castle, LLC (TOTRC) on their cross-complaint for breach of contract. Defendants have filed three consolidated appeals claiming that (1) the trial court committed prejudicial error in allowing plaintiffs to introduce parol evidence in support of their fraud claim, (2) the amount of damages awarded to them on their cross-complaint is insufficient, (3) the court erred in awarding damages to plaintiffs upon the termination of a preliminary injunction, and (4) the court erred in awarding attorney fees to plaintiffs. In light of the recent Supreme Court decision in *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169 [151 Cal.Rptr.3d 93, 291 P.3d 316] (*Riverisland*), we conclude the judgment for fraud must be affirmed. We also

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III. through VII. of the Discussion.

conclude the court erred in awarding damages with respect to the preliminary injunction. As to the claim of inadequate damages for breach of contract, defendants have failed to demonstrate error and, accordingly, we affirm the judgment on the cross-complaint. Finally, we affirm the award of attorney fees to plaintiffs.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This lawsuit concerns a restaurant property known as "Julius' Castle," an official historical landmark in the City and County of San Francisco (the City). Payne is the managing member of TOTRC. He purchased the property in June 2006. The restaurant that had been operating on the site closed shortly thereafter. Plaintiffs Stinson and Bonjean desired to re-establish the restaurant, planning to realize a profit at a later date by selling the business for approximately $1 million. According to their complaint, the two men are "very well qualified restaurateurs with well over 38 years of successful operations."

On April 20, 2007, Stinson and Bonjean (through JCRI), entered into a long-term lease (the Lease) with defendants. Section 10 of the Lease concerns the condition of the premises and provides: "Tenant acknowledges that as of the date of this Lease, Tenant has inspected the Premises and all improvements on the Premises and that the Premises and improvements are in good order, repair, and condition." Section 34 contains the agreement's integration clause and provides: "This instrument constitutes the sole agreement between Landlord and Tenant respecting the Premises, the leasing of the Premises to Tenant, and the specified lease term, and correctly sets forth the obligations of Landlord and Tenant. Any agreement or representations respecting the Premises or their leasing by Landlord to Tenant not expressly set forth in this instrument are void. This agreement, however, is to be read and interpreted in a manner consistent with the contract of Tenants with [TOTRC], entered into contemporaneously herewith, and through which Tenants are acquiring the fixtures, goodwill, website, liquor license, and trade name of Julius' Castle."

2

On May 3, 2007, JCRI entered into a bulk sales agreement (the BSA) with TOTRC for the purchase of all the restaurant's business assets, including its fixtures, equipment, trade name, leasehold improvements, and liquor license.

On August 16, 2007, escrow closed on the BSA.

On November 21, 2007, Payne sent JCRI a notice of default. The notice alleged plaintiffs had failed to timely make installment payments on the BSA, and had made unauthorized and improper deductions from one or more of the payments that had been made. Payne demanded immediate payment of the entire principal owing on the BSA.

On November 26, 2007, Payne sent Stinson and Bonjean a demand for guarantor's performance based on their personal guaranty of the Lease.

On March 18, 2008, plaintiffs filed their first amended complaint (FAC) against defendants. The FAC alleges causes of action for (1) breach of contract, (2) breach of warranty, (3) fraudulent misrepresentation, (4) negligent misrepresentation, (5) fraudulent concealment, (6) rescission,[1] (7) fraud and deceit, (8) unfair business practices, (9) breach of covenant of good faith and fair dealing, (10) injunctive relief, (11) intentional infliction of emotional distress, and (12) negligent infliction of emotional distress.[2] The FAC alleges that both the Lease and the BSA omitted certain material facts, including that defendant had made substantial improvements to the property without having obtained the proper permits. It also alleges Payne had orally misrepresented that the facility was in good condition, and falsely assured them that he would make it good if it was not.

On April 3, 2008, defendants filed a cross-complaint against plaintiffs, alleging causes of action for breach of contract, declaratory relief, and breach of the covenant of good faith and fair dealing.

On July 3, 2008, the trial court issued a preliminary injunction, restraining plaintiffs from selling, transferring, or disposing of the restaurant's liquor license.

_____

[1] On June 3, 2009, plaintiffs dismissed the cause of action for rescission against TOTRC only.

[2] On April 12, 2010, the trial court granted defendants' motion for nonsuit as to the claims for intentional and negligent infliction of emotional distress.

3

On September 30, 2009, defendants filed seven pretrial motions in limine. Motion in limine No. 2 sought to exclude the introduction of parol evidence. Defendants noted plaintiffs' claims for fraudulent and negligent misrepresentation were based on the assertion that Payne had told them the property was in good condition. The FAC also alleges Payne assured them an inspection was not necessary, " 'and guaranteed that he would fix anything that was not working or in proper running order.' " Defendants claimed these alleged statements should be excluded because they contradict the terms of the parties' written agreements.

On March 12, 2010, defendants filed a supplement to their motion in limine No. 2. In it, they argued the fraud exception to the parol evidence rule (Code Civ. Proc., § 1856, subd. (g))[3] "does not apply where parol evidence is offered to show a fraudulent promise directly at variance with the terms of the written agreement." They relied on *Bank of America etc. Assn. v. Pendergrass* (1935) 4 Cal.2d 258, 263 [48 P.2d 659] (*Pendergrass*).

On March 30, 2010, the trial court denied in part and granted in part defendants' motion in limine No. 2. At the hearing, the court stated: "Well, I think the jury can consider whether [plaintiffs] were, in fact, fraudulently induced to sign the Lease and the contract based on statements that are not part of the contract. And if they believe that the statements were made and if they believe that that's what fraudulently induced [plaintiffs] to sign the Lease and/or to sign the [BSA], then they may consider that, and for that limited purpose only." The court later clarified: "Statements made which could be construed as fraud in the inducement to get them to sign the Lease and the [BSA] will be permitted for that limited purpose only, but not after the signing of either of those agreements, in which case it would clearly be an attempt to utilize parol evidence to modify the terms of the written contract." Thereafter, defendants asked the court to give a limiting instruction stating that this evidence could be considered only as to plaintiffs' claim that they were fraudulently induced into executing the contracts, and not for any other purpose.

---

[3] Code of Civil Procedure section 1856, subdivision (g) provides, in relevant part, that the parol evidence rule "does not exclude other evidence . . . to establish illegality or fraud."

*I. The Trial*

*A. The Decision to Lease Julius' Castle*

At the time of trial, Stinson had been in the restaurant business for over 35 years as the owner and operator of Sinbad's Pier Two restaurant in the City. He had also recently opened a restaurant and yogurt shop in Hayward. Bonjean had worked at Sinbad's for many years. Payne was a casual customer of Sinbad's for at least 10 years.

One evening, Payne came to Sinbad's and told Stinson and Bonjean that he had purchased the Julius' Castle restaurant and had made extensive renovations to the property.[4] The restaurant is located on Telegraph Hill and has been in existence since the early 1920's. It is a destination location, often used for special occasions. Stinson and Bonjean expressed interest, and Payne asked them to look at the property and decide if they wanted to take part in reopening the restaurant, which had been closed for about nine months.

Subsequently, the parties did a walk-through tour of Julius' Castle. They went through each floor of the building, and Payne explained some of the improvements he had made. In the kitchen area, all of the equipment had been cleaned and appeared to be in good condition, though nothing was operating at the time. Payne testified he assumed everything worked because the former owner, who had operated the restaurant, did not say that anything was wrong.[5]

Because the restaurant had been closed for almost a year, Stinson was concerned as to whether the equipment and the plumbing were in working order. He testified Payne assured him that everything worked. Payne also said if anything was not working, he

---

[4] Payne testified in plaintiffs' case as an adverse witness. He stated he had renovated a space next to the third-floor service kitchen by attaching a wall and a roof to two preexisting walls. This added about 60 square feet of space. He also expanded the front of an unattached building that was being used as an office. He did not obtain building permits or a Certificate of Appropriateness from the City's Planning Department prior to making the renovations. He did not know such a certificate was necessary.

[5] Jeffrey Pollack owned Julius' Castle restaurant for 26 years before he sold it to Payne in 2006. When he sold the restaurant it was in full operation. The equipment was in reasonable working condition. He had remodeled the kitchen in 1999, so the equipment was about seven years old, which he testified is young for commercial restaurant equipment. Pollack never told Payne that there were any problems with the equipment.

5

would fix it.  He told Stinson and Bonjean that he had spent about $600,000 on building renovations.  They did not test the equipment because they "took Mr. Payne for his word that if anything is not working he would fix it."  Additionally, it appeared all the utilities were turned off, making it impossible to test the equipment under realistic working conditions.  They depended on and accepted Payne's verbal commitment that he would make everything workable.  They did not ask for an opportunity to test the equipment, nor did they hire a third party to do so.

Payne denied telling Stinson and Bonjean that he would repair the equipment or fix anything else on the premises.  He did not guarantee the equipment's condition.  He did say the equipment was in full operation when he bought the property.  They did not ask to test anything in the kitchen.  The utilities were turned on at that time, and he would have been willing to provide them access to any part of the premises for inspections or testing.  They also never said they intended to sell the restaurant at any point.  Had he known this, he would not have gone forward with the Lease.  Prior to signing the Lease, Payne did not know he could be cited by the City's Planning Department (the Department) for his renovation work.

### B. *The Parties Negotiate the Lease and the BSA*

The parties entered into extensive negotiations for the Lease and for the purchase of the restaurant's assets.  Bonjean testified, "Nobody wants to go into business without a lease.  It's very important."  Stinson and Bonjean worked with Gordon Wong, who was Payne's broker and executor.[6]  They expressed their concerns about the equipment to Wong: "We mentioned that to him many times, because you can't operate any type of a specialty restaurant business unless you have equipment that's workable.  Whenever there's downtime and something breaks, something has to be fixed, it's not only expensive, but you cannot fulfill your obligation to your customer."  Wong reassured them that Payne would fix any major problems with the building and the equipment.

---

[6] Payne denied Wong was his legal agent.  Instead, he claimed Wong was a friend who was assisting in the transaction.

6

The final version of the Lease was signed on April 20, 2007, after Stinson and Bonjean's Nevada corporation (JCRI) was finalized. They had approximately five to seven meetings with Wong before they signed the Lease. Wong would report their negotiations to Payne who would talk to his attorney, a process that resulted in numerous drafts. The drafts "never came back the way that we had agreed to in our conversation" so the process was "a back-and-forth type thing." With a few exceptions, the final Lease was in accordance with what they had discussed. Bonjean testified that the final version did not include a personal guaranty. The parties went through every page of the Lease together to ensure they were all satisfied with the document. They also made edits reflecting that Stinson and Bonjean were acting through their Nevada corporation.

The BSA allowed JCRI to purchase the restaurant's assets from TOTRC, including the equipment, the liquor license, and the restaurant's website. The total payment for BSA was $240,000, which Bonjean thought was a fair price.[7] The Lease payment was set at $15,000 per month for 10 years, and the payments on the BSA were set at $10,000 a month. After signing the Lease, plaintiffs gave Payne a $25,000 check as a deposit.

On cross-examination, Bonjean stated the drafting of the Lease took several weeks. He and Stinson asked many questions so that they would feel confident and satisfied with the final version. They did not feel rushed. He acknowledged the Lease does not reflect Payne's alleged promise to fix anything that did not work. Bonjean never asked that such a provision be included. He also never asked for any changes to section 10 of the Lease, which states that he and Stinson had inspected the premises and improvements and found them to be in good order, repair, and condition. He agreed the provisions of the Lease pertaining to repairs and maintenance do not call for Payne to fix the equipment and improvements. He conceded having everything in working order is very important to operating a restaurant. He also acknowledged the Lease's integration

---

[7] The officer who handled the escrow testified the BSA concerned fixtures and equipment, trade name, leasehold improvements and all business assets. The breakdown of the assets here was as follows: $30,000 for the liquor license, $18,000 for the fixtures and equipment, $12,000 for the trade name, and $180,000 for leasehold improvements.

7

clause states that any agreements or representations made outside of the written contract are void.

At trial, Stinson said he did not agree with the integration clause because there were "implied provisions" that everything was in working order. When asked why he did not modify the Lease to reflect that Payne was going to maintain the equipment and the premises despite the contradictory language in the agreement, Stinson said it was not necessary because the obligation was already implied and Payne had already promised to make any needed repairs. Payne did fix some things prior to the close of escrow, but stopped thereafter.

## C. The Restaurant Opens

After the Lease was executed, plaintiffs took steps to get the restaurant running, such as putting in new carpet, planning for promotion, creating a menu and a wine list, hiring kitchen help, and purchasing inventory. About three months later, Bonjean received an inventory list of equipment and fixtures purchased through the BSA. They did not actually receive all of the items listed. For example, an espresso machine was missing, and a refrigerator had been misrepresented as a freezer, causing them to have to buy their own freezer.[8] Meanwhile, they had continual problems operating much of the equipment, including the salamander (a type of broiler), the ovens, and the refrigerators.[9] Additionally, the phone system did not work properly because Payne had cut the cables during his renovations. The credit card machines broke down and employees had to run customers' cards by hand because of the faulty phone lines.

In May 2007, Stinson received a fax from the Department that included a notice of violation. The violation related to alterations allegedly done without building permits or a Certificate of Appropriateness (Certificate), which was required because of the property's status as a historic landmark. On the day the restaurant opened it was granted

---

[8] Bonjean did not ask Payne for an inventory of every item that was being purchased under the BSA. Afterwards, he was provided with an inventory list. He noticed the list included the espresso machine, which was not in the restaurant when he and Stinson took it over.

[9] When they complained about the refrigerator, Payne hired a repairman who concluded the employees were leaving the door open on the walk-in unit, causing the food to become warm.

a temporary health permit. The permit was conditioned on filing for a Certificate. Previously, Bonjean and Stinson had not known there were any permitting issues. They never received a regular health permit. Because Payne had made major changes to the building without having obtained a Certificate, Stinson believed the Department could have revoked the permit and closed the restaurant. However, they operated off the temporary health permit for several months, and no one from any public agency ever told them to shut the restaurant down or tried to interfere with its operation.

Reza Khoshnevisan, Payne's architectural consultant, testified that Payne received a conditional Certificate in December 2008. During the approval process, no one threatened to shut down the restaurant. A competent contractor could have completed the required alterations in two weeks to a month. He acknowledged that, considering the politics of doing construction in the City, it was both surprising and unwise for Payne to have made renovations to the premises without first obtaining permits.

After the restaurant was open for a few months, business "shot up big" and it performed almost twice as well as Stinson had anticipated.[10] He and Bonjean decided to sell the restaurant sooner than they had planned. They entered into a contract to sell Julius' Castle through the BTI Group, a company specializing in restaurant sales. A business broker with the BTI Group tried to market the restaurant. He intended to sell it for between $500,000 to $1 million. No written offers were received. He had one interested buyer but the transaction did not progress because the buyer learned there was pending litigation, which could have interfered with transferability of the Lease to a new owner. At that point, BTI ceased its marketing efforts.

According to Stinson, they were unable to market the restaurant because they misplaced their copy of the Lease. A flood downstairs at Julius' Castle had forced them to move their business records and they lost track of the document. When they received a copy of the Lease from Payne's attorney, Stinson was distressed because the document

---

[10] Bonjean stated at his deposition that he did not believe the restaurant actually turned a profit during the time he operated it.

was a draft, and not the correct final version. The document also included a personal guaranty that Stinson and Bonjean had never signed.

A real estate agent specializing in retail leasing who testified on behalf of defendants stated that for a restaurant like Julius' Castle, she would expect the tenants to have set aside six months' worth of operating expenses. She would also expect prospective tenants to have an operating budget. Potential buyers of a restaurant would want to see a good long-term lease in addition to longevity and stability. They would also want to view profit-loss statements covering no less than two to three years. She had never seen a restaurant in the City that had been in operation for only eight months be successfully sold to a new buyer.

## D. Disputes Arise Between the Parties

The parties soon had conflicts over repairs. In general, Payne was slow at making repairs, causing plaintiffs to spend their own money to keep the restaurant operational. For example, Bonjean had to hire someone to install temporary phone lines. They sent the bill for the installation to Payne because they felt it was his duty to fix the problem. Payne often refused to reimburse them for repairs. He also billed them for a plumbing problem involving a large pipe that had to be removed. At one point, Payne also locked Stinson and Bonjean out of an apartment on the property that they had planned to use as an office.[11]

According to Payne, Bonjean approached him several times to fix the equipment when Payne was working on unrelated projects in the building. It never appeared that Stinson and Bonjean had hired a maintenance person of their own. He did not believe he had an obligation to fix these problems, but he had workers with him at the time and it was not hard for him to provide assistance. He also wanted the restaurant to be successful. On July 10, 2007, he sent a letter to them stating that he would no longer undertake such repairs. They did not immediately object or assert that he had promised to do so.

---

[11] Payne testified he locked the unattached building because renovations had not been completed and one of plaintiffs' employees was attempting to use it as a residence.

10

On October 24, 2007, Stinson sent a letter to Payne and his attorney complaining that Payne was neglecting his obligations to keep the building and the equipment in working order. Payne sent a letter in reply. He did not respond to Stinson's complaints. Instead, he told them they were in violation of a valet zoning permit. Around this time, he also sent a three-day notice to pay rent or quit when they were one day late on the rent. They paid the rent that month, including a $1,500 late charge.

Plaintiffs made the $10,000 monthly BSA payment in July, August and September of 2007. After September, they did not pay the full amount due. Instead, they reduced the amount by taking deductions for repair costs, paying just $3,418 in October, $800 in November, and $375 in December.[12] They did not make any payment in January.[13] At trial, Stinson could not recall all of the repairs that he relied on to justify the deductions he made from the BSA payments. One problem was that the ice machine never worked properly. Additionally, a walk-in refrigerator was never cold enough. They had to install new fans, motors, and condensers in the refrigerators. The salamander and the ovens also did not work. Payne said he would replace them in the first three months. He did bring in some new equipment, but "slow rolled" it.

After Stinson and Bonjean started deducting money from their monthly payments, Payne asked his attorney to notify them that they were in default on the Lease and the BSA. He filed notices against them to pay or quit. They did not leave within the noticed periods, nor did they pay. He never filed an actual eviction lawsuit.

In November 2007, Payne sent plaintiffs a 10-day notice to pay or quit. The notice said they had defaulted on the payments owed under the BSA. At that point, Stinson told the BTI Group that they could not sell the restaurant. He also contacted an attorney to handle the notice. He and Bonjean left Julius' Castle in January 2008 after closing their affairs. In Stinson's view, they had been evicted. They did not make any

---

[12] Bonjean deducted $4,700 from the December BSA payment for a grease trap that they did not actually install.

[13] They also did not pay the rent in January because they had received the notices to pay or quit. They were advised by their attorney to vacate the premises.

11

payments in January 2008 because they had been evicted. Stinson informed their vendors that JCRI would be unable to make payments on its accounts due to an unlawful eviction, and explained he would be filing a lawsuit to recoup the monies owed.

On cross-examination, Stinson admitted he did not have a written business plan or a written budget when he started the restaurant. Initially, he and Bonjean each invested $25,000 in the restaurant, along with a $20,000 line of credit. They obtained a $100,000 loan shortly after the restaurant opened. They paid about half of that off before they closed the restaurant, at which point they stopped making payments. They also stopped paying sales taxes that were owed. He believed the restaurant made a profit just about every month it was in business. A document prepared by his bookkeeper showed gross sales increased from $25,757 in June 2007 to $190,445 in December 2007.

Bonjean testified that he had anticipated a profit of at least $500,000 upon the sale of the restaurant. When asked on cross-examination why he and Stinson didn't pay Payne the arrearages on the BSA payments so that they could realize the future profit from selling the business, Bonjean stated they did not have a concrete purchase offer at that time. Though the restaurant did very well in December 2007, they did not consider making good on the BSA payments because they were served with the eviction notice. The instant lawsuit was filed on December 5, 2007, before plaintiffs had vacated the premises.[14]

### E. Proceedings After Close of Evidence

The trial court granted defendants' motion for nonsuit on the claim for breach of warranty. The court denied their motion for nonsuit on the fraud claim, stating "the parol evidence that's been adduced is admissible for the jury to consider on the issue of whether there was fraud in the inducement." Defendants proposed the following special jury instruction: "You may consider the alleged representations that James Payne would fix anything at the restaurant that did not work right only with respect to plaintiffs' claim

---

[14] Since then, Payne has been unable to rent the restaurant because plaintiffs have refused to return the liquor license.

12

that they were fraudulently induced into entering into the Lease and not for any other purpose or for any other claims made by the plaintiffs in this case."[15]

During closing arguments, plaintiffs' counsel asserted her clients were not able to test the equipment before they entered into the Lease. Instead, Payne offered to repair anything that was not working. She argued he intentionally lulled them into complacency by fixing equipment until the BSA went through escrow, covering just enough time for the transaction to close. She claimed he knew the Department was investigating him when he first approached her clients, and that he tricked them into opening the restaurant. Plaintiffs sought damages for the lost business opportunity of selling the restaurant.

Defense counsel noted Payne's alleged promise to make repairs is not set forth in the agreements. Instead, the agreements place the burden on plaintiffs to maintain the premises and equipment. Additionally, he pointed out the Lease's integration clause states any promises not contained in the Lease are void. He argued the restaurant had failed because the business was undercapitalized. He further asserted that the deductions from the BSA were made because plaintiffs were running out of money, not because they were incurring repair expenses. He also claimed the Certificate was a non-issue, as the Department had not threatened to shut down the restaurant and had given Payne three years to return the building to its prior condition.

## F. Verdict

The jury found against plaintiffs on their breach of contract claim, finding they had failed to substantially perform. It found in favor of them on the intentional misrepresentation claim, specifically finding that Payne had made a false representation of material fact, intending their reliance.[16] The jury also concluded they reasonably relied on the representations to their detriment. The jury also returned a verdict in favor

---

[15] The actual jury instructions given were not recorded in the reporter's transcript. Nor does a written copy appear in the clerk's transcript. Accordingly, the record does not conclusively establish that the trial court gave this instruction.

[16] With respect to the fraud claims, defense counsel later noted the jury found a misrepresentation was made but "we don't know exactly which misrepresentation they decided to find on."

13

of their negligent misrepresentation cause of action. Economic damages were set at $294,000. The jury found plaintiffs were contributorily negligent, allocating fault at 70 percent for defendants and 30 percent for plaintiffs. It found Payne had not acted with oppression, fraud, or malice.

As to the cross-complaint, the jury found JCRI had breached the Lease by improperly deducting amounts from its BSA payments. The jury assigned contract damages at $75,000. It also found that Stinson and Bonjean had not personally guaranteed the contract.

Judgment was filed on September 29, 2010. The trial court set damages for plaintiffs at $205,800 after the reduction for comparative negligence. The court affirmed the $75,000 award on the cross-complaint.

## II. Posttrial Proceedings

On September 29, 2010, the trial court terminated the preliminary injunction entered on July 3, 2008, which had enjoined plaintiffs from transferring the liquor license. The court awarded plaintiffs $15,000 in damages from defendants' bond.

On October 14, 2010, Payne filed a motion for judgment notwithstanding the verdict.

On October 25, 2010, Payne filed a motion for a new trial. Within his motion, he asserted the trial court had improperly denied his motion in limine to exclude parol evidence.

On October 27, 2010, Payne filed a motion for attorney fees, asserting that he was the prevailing party in the breach of contract claim.

On November 29, 2010, plaintiffs filed a motion for attorney fees and costs.

On December 13, 2010, the trial court denied Payne's motion for a new trial.

On December 15, 2010, the trial court denied Payne's motion for judgment notwithstanding the verdict.

On December 16, 2010, the trial court denied Payne's motion for attorney fees and declared plaintiffs the prevailing party under Code of Civil Procedure section 1032.

14

On December 28, 2010, Payne filed a notice of appeal from the judgment entered on September 29, 2010.

On January 7, 2011, Payne filed a notice of appeal from the order denying his motion for judgment notwithstanding the verdict and the trial court's ruling on the preliminary injunction.

On January 31, 2011, plaintiffs filed a motion for attorney fees and costs.

On April 14, 2011, the trial court granted plaintiffs' motion for attorney fees and costs, awarding $158,180.75. Defendants filed an appeal of this order on April 21, 2011.

On September 20, 2011, we granted Stinson's motion to consolidate the three appeals.

## DISCUSSION

### I. The Parol Evidence Rule

The parol evidence rule is codified in Civil Code section 1625[17] and Code of Civil Procedure section 1856 (section 1856).[18] In general, the rule prohibits the introduction of any extrinsic evidence to alter, vary, or add to the terms of an integrated written agreement. (*Casa Herrera, Ins. v. Beydoun* (2004) 32 Cal.4th 336, 343 [9 Cal.Rptr.3d 97, 83 P.3d 497] (*Casa Herrera*).) Under the rule, "the terms of a writing intended by the parties as a final expression of their agreement cannot be contradicted by evidence of either a prior agreement or a contemporaneous oral agreement." (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 352 [112 Cal.Rptr.3d 455].) The parol evidence rule is a longstanding, well-known principle that promotes fairness and predictability by encouraging parties to specify the entirety of their agreements in writing. The policy is "based on the assumption that written evidence is more accurate than human memory" and "the fear that fraud or unintentional invention by witnesses

---

[17] Civil Code section 1625 provides: "The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument."

[18] Section 1856, subdivision (a), states: "Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement."

15

interested in the outcome of the litigation will mislead the finder of facts." (*Masterson v. Sine* (1968) 68 Cal.2d 222, 227 [65 Cal.Rptr. 545, 436 P.2d 561].)

The parol evidence rule is not an evidentiary rule. (*Casa Herrera, supra,* 32 Cal.4th 336, 343.) "Thus, '[u]nder [the] rule[,] the act of executing a written contract . . . *supersedes* all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument.' [Citation.] And '[e]xtrinsic evidence cannot be admitted to prove what the agreement was, not for any of the usual reasons for exclusion of evidence, but because as a matter of law the agreement is the writing itself. [Citation.]' [Citation.] 'Such evidence is legally irrelevant and cannot support a judgment.' [Citation.]" (*Id.* at p. 344.)

We conclude the evidence of Payne's alleged guarantee as to the quality of the restaurant's equipment is inconsistent with the express representation in the Lease that plaintiffs had relied upon their own inspection in finding the premises and improvements to be in "good order, repair, and condition." Payne's alleged promise to repair any faulty equipment is also inconsistent in that it does not appear in the Lease or the BSA. Indeed, the Lease provides that the tenant agrees "at Tenant's own expense, to keep the Premises . . . in good condition and repair . . . ." Under the Lease, Payne's repair obligation is limited to being responsible for "maintaining the roof and the structural integrity of the building premises." Further, the Lease provides that JCRI agreed to waive all statutory provisions or any other laws requiring Payne to maintain or repair the property, or permitting JCRI to make needed repairs and deduct the repair costs from the rent. Payne's alleged oral statements are thus directly at variance with the terms of the Lease and the BSA. Accordingly, we agree with defendants that the contested oral statements constitute parol evidence. However, the recent Supreme Court decision in *Riverisland* overruling *Pendergrass* establishes that the evidence is admissible under the statutory exception for fraud found in section 1856, subdivision (g).

## II. *The Exception for Fraudulent Inducement*

"Section 1856, subdivision (f) establishes a broad exception to the operation of the parol evidence rule: 'Where the validity of the agreement is the fact in dispute, this

16

section does not exclude evidence relevant to that issue.' " (*Riverisland, supra,* 55 Cal.4th 1169, 1174.) Section 1856, subdivision (g), expressly states: "This section does not exclude other evidence . . . to establish illegality *or fraud.*" (Italics added.) With respect to fraudulent inducement, " 'It is . . . settled that parol evidence of fraudulent representations is admissible as an exception to the parol evidence rule to show that a contract was induced by fraud.' [Citations.]" (*Pacific State Bank v. Greene* (2003) 110 Cal.App.4th 375, 389 [1 Cal.Rptr.3d 739]; accord, *Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 42 [61 Cal.Rptr.2d 518]; *Ron Greenspan Volkswagen, Inc. v. Ford Motor Land Development Corp.* (1995) 32 Cal.App.4th 985, 995 [38 Cal.Rptr.2d 783].) Fraud in the inducement occurs " 'when " 'the promisor knows what he is signing but his consent is *induced* by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is *voidable*. . . .' " [Citation.]' " (*Pacific State Bank, supra,* at p. 389, fn. 7, quoting *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 415 [58 Cal.Rptr.2d 875, 926 P.2d 1061].)

As noted above, at trial defendants relied on *Pendergrass, supra,* 4 Cal.2d 258, 263–264, in which the Supreme Court held that parol evidence is inadmissible to prove a fraudulent promise directly at variance with the terms of a written agreement. In that case, the court announced: "Our conception of the rule which permits parol evidence of fraud to establish the invalidity of the instrument is that it must tend to establish some independent fact or representation, some fraud in the procurement of the instrument or some breach of confidence concerning its use, and *not a promise directly at variance with the promise of the writing*." (*Id.* at p. 263, italics added.) One noted impact of the *Pendergrass* holding was that the parol evidence rule effectively immunized against liability for *both* prior and contemporaneous statements at variance with the written contract, and implied that the alleged wrongdoer is innocent of fraud. (*Casa Herrera, supra,* 32 Cal.4th 336, 347.)

In briefing this appeal, defendants also relied heavily on *Pendergrass.* After the parties submitted their briefs, but prior to oral argument, we asked them to submit letter briefs on the impact of the Supreme Court's recent *Riverisland* decision. Defendants

17

argue that even under *Riverisland,* "the fraud exception to the parol evidence rule is not applied to agreements entered into by sophisticated parties after extensive negotiations." In support of their argument, they assert the Supreme Court relied on authorities holding forth a rule "that sophisticated parties can rarely invoke the fraud exception." While the court may have cited to authorities that discuss a potential exception for sophisticated parties, defendants' premise is unsupported by the language of the opinion itself. To the contrary, the court decisively overruled *Pendergrass*: "[W]e conclude that *Pendergrass* was *an aberration*. It purported to follow section 1856 [citation], but its restriction on the fraud exception was inconsistent with the terms of the statute, and with settled case law as well." (*Riverisland, supra,* 55 Cal.4th 1169, 1182, italics added.) In so concluding, the court reaffirmed "the venerable maxim stated in *Ferguson v. Koch* [(1928) 204 Cal. 342, 347 [268 P. 342]]: '[I]t was never intended that the parol evidence rule should be used as a shield to prevent the proof of fraud.' " (*Ibid.*) Also *Pendergrass* "departed from established California law at the time it was decided" without acknowledging or justifying "the abrogation." (*Riverisland, supra,* at p. 1172). With such blunt language, the court did not shield sophisticated parties from the reach of its holding.

Defendants also argue that *Riverisland,* and the authorities it cites, "require that the circumstances of each case and the bargaining power of [each party] be considered." Defendants also claim that "inquiry into the relative sophistication of the parties is simple." Perhaps. In our view, however, our high court sought the opposite result, namely, to create certainty and consistency by eliminating altogether the judicially created exception to section 1856, subdivision (g). We also note that the plaintiffs in *Riverisland* appear to have been relatively sophisticated business people. While the defendant in that case was an established lender, the plaintiffs operated a corporation and thus had experience with business contracts. In light of these facts, distinguishing sophisticated business parties who should be barred from introducing parol evidence of fraud from those who should be permitted to introduce such evidence is not as simple as defendants suggest.

18

In the post-*Riverisland* world, parties would be better served in addressing the heightened burden of proving fraud in a civil action. Fraud demands specialized pleading. (*Small v. Fritz Companies, Inc.*) (2003) 30 Cal.4th 167, 182 [132 Cal.Rptr.2d 490, 65 P.3d 1255]; *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645 [49 Cal.Rptr.2d 377, 909 P.2d 981].) Credibility of the parties who negotiated the agreement and their relative bargaining positions will be assessed. Attention will now focus on the justifiable reliance element of fraud. (*Seeger v. Odell* (1941) 18 Cal.2d 409, 415 [115 P.2d 977, 136 A.L.R. 1291]; *Blankenheim v. E. F. Hutton & Co.* (1990) 217 Cal.App.3d 1463, 1474 [266 Cal.Rptr. 593].) Among the questions to ask are: What are the plausible reasons for the alleged discrepancy between the claimed oral promises and the signed writing? Is there compatibility between the oral representations and the written document? What is the evidence relating to whether the document was read and considered before signing? (Sweet, *Promissory Fraud and the Parol Evidence Rule* (1961) 49 Cal. L.Rev. 877, 905.) Again, we decline to carve out an exception to the *Riverisland* holding that the court itself did not endorse.[19]

Finally, defendants note one of the justifications for the *Riverisland* decision was to avoid shielding fraudulent practices. They argue, however, that "Although this is a valid concern, *Riverisland* is strong medicine and must be applied only when the circumstances call for it: with contracts of adhesion where there is a disparity in bargaining power." Again, the court did not limit its holding to contracts of adhesion and we decline to read such a limitation into the decision. Accordingly, in light of the Supreme Court's overruling *Pendergrass* in *Riverisland,* we conclude the parol evidence was properly admitted at trial under the statutory exception for fraud.

Our conclusion that parol evidence is admissible as to fraud claims involving sophisticated parties does not create any injustice. A party claiming fraud in the inducement is still required to prove they relied on the parol evidence and that their

---

[19] Along these lines, defendants state: "Now that *Pendergrass* has been overruled, analysis of whether the fraud exception applies is much simpler." This is an unintended understatement. The fraud exception is a potential defense, and the Supreme Court has clarified the limits of the parol evidence rule in contract cases.

reliance was reasonable. In the present case, the burden was on plaintiffs to prove that, notwithstanding both the Lease's integration clause and the "as is" language with respect to the restaurant equipment, they reasonably relied on Payne's prior oral assurances in entering into the agreements. The jury concluded they met this burden, and substantial evidence supports the jury's findings.

## III. *Award of Damages to Stinson and Bonjean*

Defendants claim the awarding of damages to Stinson and Bonjean is reversible error because only JCRI entered into the Lease and the BSA. They assert there are no legal grounds upon which to award the two men money for damages allegedly incurred by the corporate entity, as they were not individual parties to either agreement.

Defendants rely solely on the alter ego doctrine: " 'Ordinarily, a corporation is regarded as a legal entity separate and distinct from its stockholders, officers and directors. Under the alter ego doctrine, however, where a corporation is used by an individual or individuals, or by another corporation, to perpetrate fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, a court may disregard the corporate entity and treat the corporation's acts as if they were done by the persons actually controlling the corporation. . . .' [Citation.]" (*Robbins v. Blecher* (1997) 52 Cal.App.4th 886, 892 [60 Cal.Rptr.2d 815].) The doctrine itself addresses a legal theory for seeking redress for corporate wrongdoing. It does not stand for the proposition that the individual owners of a corporation may not be awarded damages for injuries sustained by the corporation, and defendants have not provided us with any authority so stating. Accordingly defendants have not provided a legal basis upon which to invalidate the damages awarded to Stinson and Bonjean.

## IV. *Damages for Lost Profits*

Defendants claim plaintiffs are not entitled to damages for lost profits "as a matter of law." They assert the trial court abused its discretion in allowing testimony about plaintiffs' claimed lost profits because there was no evidence that the occurrence and extent of future lost profits was reasonably certain. The trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. (*People v. Davis* (2009) 46

20

Cal.4th 539, 602 [94 Cal.Rptr.3d 322, 208 P.3d 78].)  To establish an abuse of discretion, the complaining party must show that " 'the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation].'  [Citation.]" (*People v. Carrington* (2009) 47 Cal.4th 145, 195 [97 Cal.Rptr.3d 117, 211 P.3d 617].)

Damages for lost profits from an established business are generally awardable where " 'there has been an operating experience sufficient to permit a reasonable estimate of probable income and expense . . . .' " (*Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 989 [105 Cal.Rptr.2d 88], quoting *Fibreboard Paper Products Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 703 [39 Cal.Rptr. 64].)  However, in cases where the defendant has made it impossible for a plaintiff to realize any profits, he or she "cannot complain if the probable profits are of necessity estimated." (*Natural Soda Prod. Co. v. City of Los Angeles* (1943) 23 Cal.2d 193, 200 [143 P.2d 12].)  " 'It is enough to demonstrate a reasonable probability that profits would have been earned except for the defendant's conduct.' " (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 884 [116 Cal.Rptr.2d 158], quoting *S.C. Anderson, Inc. v. Bank of America* (1994) 24 Cal.App.4th 529, 536 [30 Cal.Rptr.2d 286].)

Defendants rely heavily on *Parlour Enterprises, Inc. v. Kirin Group, Inc.* (2007) 152 Cal.App.4th 281 [61 Cal.Rptr.3d 243].  In that case, an action for breach of an agreement to subfranchise an ice cream parlor company, the Court of Appeal found the evidence speculative and insufficient to show lost profits were reasonably certain to occur, or the extent of any lost profits, in connection with three proposed restaurants. (*Id.* at pp. 288–289.)  Specific plans for opening the restaurants had been developed, but they were not established businesses.  The appellate court found expert projections of lost profits did not support the lost profits award where the projections were not based on actual operations, and the evidence of comparable businesses failed to show the profit and loss experience of these businesses were sufficiently similar to the subject company's restaurants. (*Id.* at p. 290.)

21

Here, Julius' Castle was not a new, unestablished business.  The restaurant had been operating for many decades prior to the parties' involvement.  Further, Stinson and Bonjean both had significant experience in the restaurant industry.  Plaintiffs did offer evidence as to the restaurant's business volume during the months they operated the restaurant.  There was uncontested evidence at trial that by the time the business closed its revenues exceeded $190,000 per month.  The broker for BTI testified that the business had been marketed for sale for $500,000 to $1 million and that there was an interested potential buyer.  Moreover, to the extent plaintiffs were unable to show profitability, this failure arguably could have been at least partially attributed to Payne's own conduct, insofar as he misrepresented the condition of the property and its equipment.  Thus, we cannot conclude the decision to admit the challenged evidence was an arbitrary, capricious or patently absurd determination that could constitute an abuse of discretion.  (See *Ghadrdan v. Gorabi* (2010) 182 Cal.App.4th 416, 421 [105 Cal.Rptr.3d 338].)  The assessment of this evidence fell within the trial court's discretion.  (See *Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1476 [69 Cal.Rptr.3d 273].)  We also conclude substantial evidence was presented at trial to support the award.

**V.  *The Award of $15,000 on the Termination of the Preliminary Injunction***

Payne claims the trial court erred in awarding plaintiffs $15,000 upon the termination of the preliminary injunction that had prevented them from selling the restaurant's liquor license.  He contends the award was procedurally and substantively improper because plaintiffs did not bring a noticed motion as required by Code of Civil Procedure section 996.440.  Plaintiffs counter that defendants waived this issue by failing to raise it in their objections to the proposed judgment after trial, instead raising the theory that the plaintiffs should have been permanently enjoined from selling the liquor license.  However, defendants did raise this exact issue in arguing their motion for a new trial.

Without citing to any authority, plaintiffs also contend that defendants' notice of appeal was filed too late, and that extensions attendant to the filing of their motions for judgment notwithstanding the verdict and new trial do not apply because the order

22

regarding the preliminary injunction was not part of the separate judgment after special verdict.[20] They assert we have no jurisdiction to hear this aspect of defendants' appeal.

Notices of appeal are to be liberally construed in order to promote resolution of cases on the merits. (*Collins v. Hemet Valley Hospital Dist.* (1986) 186 Cal.App.3d 922, 927 [231 Cal.Rptr. 92].) In *Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 22 [23 Cal.Rptr.3d 490, 104 P.3d 844], our Supreme Court held a notice of appeal from an order denying a motion for a new trial should be construed as an appeal from the underlying judgment "when it is reasonably clear the appellant intended to appeal from the judgment and the respondent would not be misled or prejudiced." Here, the order granting the $15,000 award to plaintiffs was entered on the same day as the underlying judgment. The preliminary injunction itself was terminated as a direct result of said judgment. Further, defendants explicitly contested the award in their motion for judgment notwithstanding the verdict. The trial court denied the motion "in its entirety." It is thus reasonably clear that by appealing from the judgment, defendants intended to challenge the court's ruling on the $15,000 award. That notice of appeal was timely, and plaintiffs have not been prejudiced. Therefore, we construe defendants' appeal from the judgment as an appeal from the contested order so that we may reach the merits of this issue.

When an injunction is granted, the applicant for the injunction must provide an undertaking that he or she will pay any damages—up to a specified amount—that the enjoined party may sustain as a result of the injunction. (Code Civ. Proc., § 529, subd. (a); *ABBA Rubber Co. v. Seaquist* (1991) 235 Cal.App.3d 1, 10 [286 Cal.Rptr. 518].) Liability on this bond may be enforced on a motion as part of the original action. (Code

---

[20] California Rules of Court, rule 8.108(d) provides:

"(1) If any party serves and files a valid motion for judgment notwithstanding the verdict and the motion is denied, the time to appeal from the judgment is extended for all parties until the earliest of:

"(A) 30 days after the superior court clerk, or a party serves an order denying the motion or a notice of entry of that order;

"(B) 30 days after denial of the motion by operation of law; or

"(C) 180 days after entry of judgment."

23

Civ. Proc., § 996.440, subd. (a); *Grade-Way Construction Co. v. Golden Eagle Ins. Co.* (1993) 13 Cal.App.4th 826, 829–833 [16 Cal.Rptr.2d 649].)

Code of Civil Procedure section 996.440, subdivision (a), provides: "If a bond is given in an action or proceeding, the liability on the bond may be enforced on motion made in the court without the necessity of an independent action." Subdivision (b) of this statute provides: "The motion shall not be made until after entry of the final judgment in the action or proceeding in which the bond is given *and the time for appeal has expired* or, if an appeal is taken, until the appeal is finally determined. The motion shall not be made or notice of motion served more than one year after the later of the preceding dates." (Italics added.) At the time the trial court made the award, the conditions for making such a motion had not been satisfied as the time for filing an appeal from the final judgment had not yet expired. Accordingly, the award must be reversed.

## VI. *Damages Award for Cross-complaint*

Payne contends the correct measure of damages for the breach of contract action in the cross-complaint is the full amount of unpaid rent due throughout the remainder of the Lease, or more than $2.9 million. He claims that under Civil Code section 1951.2, plaintiffs' abandonment of the premises resulted in a de facto termination, converting his continuing right to rent under the Lease into a damage claim for loss of rent due to their abandonment.

We note there is nothing in the record indicating that the jury was instructed on the issue of abandonment of the premises. In fact, the record on appeal does not include any documentation of the jury instructions that were, in fact, actually given to the jury. As to the breach of contract action in the cross-complaint, the only question on the special verdict form regarding a breach concerned the deductions plaintiffs made from payments due on the BSA. While it is true that the plaintiffs vacated the property during the Lease period, the evidence arguably supports the theory that they were induced to leave by

24

Payne's notices to pay or quit. Had Payne desired a finding that plaintiffs abandoned the Lease, he should have proposed a verdict form that would have reflected that theory.[21]

## VII. Attorney Fees

The attorney fee provision in the Lease provides, in relevant part: "If any action at law or in equity is brought to recover any rent or other sums under this Lease, or for or on account of any breach of or to enforce or interpret any of the covenants, terms, or conditions of this Lease . . . the prevailing party shall be entitled to recover from the other party . . . reasonable attorney fees."

Civil Code section 1717, subdivision (a), provides, in part: "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs." "The primary purpose of section 1717 is to ensure mutuality of remedy for attorney fee claims under contractual attorney fee provisions." (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 610 [71 Cal.Rptr.2d 830, 951 P.2d 399].) Thus, "when a party litigant prevails in an action on a contract by establishing that the contract is invalid, inapplicable, unenforceable, or nonexistent, section 1717 permits that party's recovery of attorney fees whenever the opposing parties would have been entitled to attorney fees under the contract had they prevailed." (*Id.* at p. 611.)

" ' "[T]he trial court ' "is given wide discretion in determining which party has prevailed on its cause(s) of action. Such a determination will not be disturbed on appeal absent a clear abuse of discretion." ' [Citation.]" . . .' [Citation.]" (*Roden v. AmerisourceBergen Corp.* (2010) 186 Cal.App.4th 620, 663 [113 Cal.Rptr.3d 20].) The trial court's construction of the fee-shifting language in the Lease contract is subject to de

---

[21] Plaintiffs assert there was substantial evidence that Payne did not take reasonable steps to mitigate damages, and state that the jury was instructed on failure to mitigate damages. Again, our analysis of this issue is hampered as we have no record of the instructions given.

novo review. However, the question of who was the prevailing party under the fee-shifting language, as interpreted, remains a determination within the sound discretion of the trial court.

On its face, the Lease's attorney fee provision embraces all claims, both tort and breach of contract, that make reference to the Lease because it pertains to "*any* action at law or in equity." (Italics added.) If a contractual attorney fee provision is phrased broadly enough, as this one is, it may support an award of attorney fees to the prevailing party in an action alleging both contract and tort claims: "[P]arties may validly agree that the prevailing party will be awarded attorney fees incurred in any litigation between themselves, whether such litigation sounds in tort or in contract." (*Xuereb v. Marcus & Millichap, Inc.* (1992) 3 Cal.App.4th 1338, 1341 [5 Cal.Rptr.2d 154].) Courts in California construe the term "on a contract" liberally for purposes of section 1717. (*Turner v. Schultz* (2009) 175 Cal.App.4th 974, 979 [96 Cal.Rptr.3d 659].) " ' "As long as the action 'involve[s]' a contract it is ' "on [the] contract" ' within the meaning of section 1717. [Citations.]" [Citations.]' [Citation.]" (*Id*. at pp. 979–980.) Generally, an action sounding in tort for fraud is not an action "on a contract" or an action to enforce contract provisions under section 1717. (*Stout v. Turney* (1978) 22 Cal.3d 718, 730 [150 Cal.Rptr. 637, 586 P.2d 1228]; *McKenzie v. Kaiser-Aetna* (1976) 55 Cal.App.3d 84, 89–90 [127 Cal.Rptr. 275].) However, a fraud action seeking rescission is an action "on the contract" for purposes of section 1717. (*Reveles v. Toyota by the Bay* (1997) 57 Cal.App.4th 1139, 1152 & fn. 6 [67 Cal.Rptr.2d 543], disapproved on other grounds in *Gavaldon v. DaimlerChrysler Corp*. (2004) 32 Cal.4th 1246, 1261 [13 Cal.Rptr.3d 793, 90 P.3d 752] and *Snukal v. Flightways Manufacturing, Inc.* (2000) 23 Cal.4th 754, 775–776, fn. 6 [98 Cal.Rptr.2d 1, 3 P.3d 286]; *Super 7 Motel Associates v. Wang* (1993) 16 Cal.App.4th 541, 549 [20 Cal.Rptr.2d 193].)

Defendants emphasize that plaintiffs' claims sound in tort, and that their lawsuit seeks to avoid the Lease entirely by asserting they were mislead into entering into the agreement in the first place. That plaintiffs are seeking to avoid the Lease suggests to us that their claim for fraudulent inducement is indeed an action "on the contract." Further,

26

to the extent the Lease purports to define Payne's obligations regarding the equipment, the case arguably qualifies as an action to "interpret any of the covenants, terms, or conditions" of the Lease.

Additionally, as to the cross-complaint, we note that although Stinson and Bonjean were sued for breach of contract by defendants, the jury found they had not personally guaranteed the Lease. They were therefore held not to be liable at all on any claim brought against them, thereby prevailing entirely.[22] Further, as to JCRI, it was held liable for only $75,000, a small fraction of the $2.9 million sought by defendants in their cross-complaint. In sum, we agree this litigation involves actions "on the contract," and we conclude the trial court did not abuse its discretion in concluding plaintiffs were the prevailing parties.

## DISPOSITION

The judgments on the complaint and the cross-complaint are affirmed. The award of $15,000 on termination of the preliminary injunction is reversed. The attorney fee award to plaintiffs is affirmed. The parties are to bear their own costs on appeal.

_____
Dondero, J.

We concur:

_____
Margulies, Acting P. J.

_____
Banke, J.

---

[22] Neither the amount of time spent by plaintiffs' counsel, nor the hourly rate, is contested by defendants on appeal.

Trial Court:                                          City & County of San Francisco Superior
                                                     Court


Trial Judge:                                         Hon. Tomar Mason


Attorney for Defendants and Appellants:              HAIGHT BROWN & BONESTEEL LLP

                                                     Jules Solomon Zeman


Attorneys for Plaintiffs and Respondents:            SEYFARTH SHAW LLP

                                                     Christian J. Rowley
                                                     Cody D. Knight


*Julius Castle Restaurant Inc., et al., v. Payne et al.,* A130955, A130957, A131905