Filed 3/27/18 Certified for Publication 4/23/18 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| IIG WIRELESS, INC.,<br><br>    Plaintiff, Cross-defendant and Appellant,<br><br>         v.<br><br>JOHN YI,<br><br>    Defendant, Cross-complainant and Appellant;<br><br>LAUREN KIM,<br><br>     Defendant and Respondent. | G053393<br><br>(Super. Ct. No. 30-2013-00690040)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Geoffrey T. Glass, Judge.  Affirmed.

Eanet, Matthew L. Eanet and Laine Mervis for Plaintiff, Cross-defendant and Appellant.

The Hall Law Corporation and Laurence C. Hall for Defendant, Cross-complainant and Appellant John Yi, and for Defendant and Respondent Lauren Kim.

The parties appeal and cross-appeal a judgment after a jury trial in this business dispute. Plaintiff and cross-defendant IIG Wireless, Inc. (IIG) obtained a judgment of $401,860 against defendant and cross-complainant John Yi. IIG also sued Lauren Kim, Yi's fiancée, who moved for and was granted a nonsuit during trial. Yi obtained a judgment on his cross-complaint for $122,000, resulting in a final judgment of $279,860 in IIG's favor.

Yi appeals the judgment and the court's denial of his motion for judgment notwithstanding the verdict (JNOV). In sum, he argues there was no substantial evidence to support the verdict, the court made numerous errors with respect to the introduction of evidence and its conduct of the trial, and the damage award of $122,000 on his cross-complaint was inadequate.

IIG argues there was substantial evidence to support the verdict, the JNOV was properly denied, and the damage award on the cross-complaint should be reduced. In its cross-appeal, IIG argues the court should not have granted nonsuit as to Kim. Further, IIG contends the trial court erred by denying its motion to amend the complaint and to admit certain expert testimony.

We conclude that neither the appeal nor the cross-appeal have any merit, and we therefore affirm the judgment in its entirety.

I

FACTS

A. *Underlying Facts*

IIG was formed in June 2007, and known under its name at the time, Unlimited PCS, Inc.[1] It is a distributor and retailer for cellular phones, equipment and plans for MetroPCS, a national carrier. The company has over 96 stores in southern

---

[1] The company changed its name in 2014, but for ease of reading and to avoid confusion with MetroPCS, we refer to it as IIG throughout.

2

California and in several other states, and operates stores both directly and under a dealer program with MetroPCS.

Before IIG's official formation, Yi had been doing business with MetroPCS and was the owner of several out-of-state dealers. Yi, Jimmy Hu, and Seung Lee founded IIG to become another dealer for MetroPCS with stores in southern California. Neither Hu nor Lee had experience in the industry.

Yi, Hu, and Lee were IIG's three founding shareholders. Lee provided $400,000 in investment capital, Hu was general manager of IIG, and Yi was chief executive officer (CEO) and chairman of the board.

Between June 2007, when IIG was formed, and the end of 2008, the company opened 30 stores. Yi signed personal guarantees with MetroPCS for product to sell, as well as the leases for the retail locations, while Hu and Lee did not.

The distribution of stock shares in the company is a major point of dispute. IIG claims that it initially issued 100,000 common shares of stock, with 20,000 going to Yi, and 40,000 each to Hu and Lee. A stock ledger and unsigned stock certificates dated June 14, 2007, show this distribution, as does an IRS form signed by each shareholder and attested to by Yi. Hu and Lee also testified to this at trial.

Yi testified that initial discussions had set forth a 40/40/20 allocation of shares, as IIG asserts, but because Yi was required to personally guarantee all leases, Yi requested and an agreement was reached that the share distribution would be 30,000 each to Hu and Lee and 40,000 to Yi. A September 27, 2007 document entitled "Shareholder Agreement of Unlimited PCS, Inc." (the 2007 agreement), is part of the record. The first paragraph states the agreement "dated September 27, 2007, is among John Yi, Jimmy Hu, and Seung Lee each holding 40 %, 30 %, and 30 % shares of stock . . . ." Each page includes three sets of initials, and what appears to be the signature of each individual.

Hu testified that he and Yi met with MetroPCS in November 2007, at which point the company had opened three stores. Hu was concerned about expanding

3

quickly, and specifically, about where the funding would come from. Lee was initially opposed to any expansion. Yi and Hu discussed bringing in an additional investor. Hu and Lee testified that Yi told them that MetroPCS wanted Yi to be a majority shareholder in order to expand and launch new stores. Yi denied making such a statement, testifying that nobody at MetroPCS ever told him that.

Hu and Lee testified that based on the representation that MetroPCS required him to be majority shareholder, they agreed to each contribute 5,000 shares to Yi, and another 5,000 shares to IIG. Thus, the split among the shareholders would be 30 percent each, with 10 percent held by IIG as treasury shares.[2] Hu and Lee testified, however, that due to MetroPCS's purported requirement that Yi was to be the majority shareholder, they agreed to put the 10,000 shares of treasury stock in his possession. Hu testified that Yi said he would return the treasury stock when he stepped down as CEO; that he would return the stock when other shareholders requested he do so; and that he would return the stock to future key employees. Lee testified similarly. Hu also testified that Yi understood any dividends on the 10,000 treasury shares would also be held in treasury.

The record includes another shareholder agreement, this one dated January 1, 2008 (the 2008 agreement). It names Yi, Hu, and Lee, as well as an additional individual, new investor Ho Hyun Chung. The agreement and the signature page state the percentage of interest held by each shareholder: 41 percent to Yi, 10 percent to Hu, 25 percent to Lee, and 24 percent to Chung, who made a $400,000 investment. Prior to the execution of this agreement, Yi, Hu, and Lee had various conversations about where Chung's shares should come from. Hu eventually offered 20,000 shares to Chung, but was concerned about his financial benefit if the company was successful. Hu testified Yi

---

[2] According to testimony at trial, "treasury shares" are shares held by the company, usually for future use as compensation or bonuses to employees.

4

told him he would compensate Hu for the shares. In addition to Hu's shares, 4,000 of Lee's shares went to Chung. Hu and Lee also transferred 500 shares each to Yi.

IIG's controller, Luke Cheon, also testified that Yi told him that he held 10,000 treasury stock shares that Yi could transfer to key employees. A 2010 e-mail from Chung, the new investor, to Cheon, Yi, Hu, and Lee was about proposed language for a written recap of a video meeting. One of the items addressed was the "10% reserved shares," and stated in part that Yi "stated and it was fully acknowledged by the shareholders that [Yi] has every right of the reserved shares distribution for the company when necessary under his discretion."

For his part, Yi testified that no treasury stock existed, and he replied to Chung's e-mail saying so. He testified the changes to the allocation of shares were in light of the personal guarantees he had to execute.

In 2009, an amendment (the 2009 amendment) to the shareholder agreement was executed, bringing in another new investor, Seung Hee Ko. Ko invested $400,000 in return for 21,951 shares, which came from Yi, Hu, and Lee. After the amendment, Yi owned 33.6 percent of the shares; Hu 8.2 percent; Lee 20.5 percent; Chung 19.7 percent; and Ko 18 percent. There was no mention of treasury shares or reserved shares in the 2009 amendment.

In February 2010, Chung, the 2008 investor, sent an e-mail to Yi which addressed several issues. This e-mail was copied to numerous others. One of the issues addressed was the alleged treasury shares. Chung stated, under the heading "10% share contribution to [IIG]" as follows: "This was a promise from CEO [Yi] and we would like to ask you to make the contribution in Ql 2010. This is because we believe it is fair for the company to take & accumulate the dividend for future use. We do not believe it was a misheard or misunderstanding, and accepted it as a promise of CEO. Please let us remind you that the investments and personal loans were made based on your promises and this was one of them. In addition as an investor I questioned about how the shares

5

were divided and two reasons were heard. One was that it is better for the company that you have majority share for the relationship with Metro PCS – as CEO of UPCS – to bring in better, favorable deals and the other was that you would contribute 10% to the company In a few years and you would not really care about the %."

According to IIG, Yi did not respond, but eventually transferred 4,166 of what IIG claimed was treasury stock to Cheon, the controller. Yi continued to hold, IIG alleged, 5,834 shares of treasury stock.

Shortly thereafter, in the first quarter of 2010, Chung sold his shares to IIG in return for his $400,000 investment. There was a disagreement about the disposition of the shares between Lee, Hu, and Yi. Eventually they agreed to transfer sufficient shares to Hu so that he would once again own 20,000 shares, as he had before the 2009 amendment. At a shareholder meeting in December of that year, a lengthy discussion was held about the status of the stock. An agreement was eventually reached that made no mention of treasury shares. Subsequent board actions, meetings, and tax returns also make no mention of treasury shares.

IIG claims Yi committed numerous other misdeeds during his time as CEO, including directing IIG to issue payments of $48,000 to Kim, who was his girlfriend at the time (and was his fiancée at the time of briefing). IIG claimed Kim did not perform any work for IIG and was not an employee, but stated that Yi directed Cheon, the controller, to direct IIG's payroll company to "convert" Yi's dividend payments to Kim's name. According to IIG, it had to pay withholding taxes on behalf of Kim in excess of $5,000. IIG also claimed Yi caused IIG to pay rent on an apartment after IIG had specifically terminated such authorization. Further, IIG contends Yi caused IIG to enter into agreements guaranteeing the debt of other businesses.

Yi contends he was "effectively terminated" in May 2013, when he was not reelected as CEO, president, or chairman. He remained on the board as a director. Yi continued holding his shares until he transferred all remaining shares (including what IIG

6

contends were 5,834 treasury shares) to his ex-wife in connection with their divorce agreement in January 2014. IIG repurchased the shares in 2014 at a price of $41.10 per share, for a total of $1,285,000.

IIG contends that in October 2013, while Yi was still a shareholder, he and Kim formed a competing company in Colorado in contravention of the 2008 Agreement. Yi claims that IIG owed him unpaid dividends from 2010-2013.

## B. Procedural History

IIG filed the initial complaint in this action in November 2013. In June 2014, it filed a second amended complaint (the complaint) against Yi and Kim. The complaint pleaded causes of action for breach of fiduciary duty, fraud, promissory fraud, conversion, interference with prospective economic advantage, unjust enrichment, unfair competition (Bus. & Prof. Code, § 17200), and civil conspiracy. The gravamen of the claims was Yi's purported failure to return the alleged treasury shares and dividends to IIG upon his departure. IIG also alleged breach of fiduciary duty for forming the competing Colorado company; it also claimed various other sums, including $22,000 it had paid for Yi's corporate apartment and a $50,000 consulting fee; damages for a 2008 cross-guarantee signed by Yi; and for payroll taxes regarding the funds paid to Kim.

Kim was named only in the causes of action for conversion, unjust enrichment, unfair competition, and conspiracy. The conversion claim alleged $400,000 in damages for Yi and Kim's causing IIG "to pay each of them certain sums of monies to which they were not entitled."

Yi cross-complained, alleging a common count for money and unjust enrichment (seeking the remedy of an accounting).

In due course, the matter proceeded to trial. IIG pursued its claims for breach of fiduciary duty, fraud, promissory fraud, and conversion against Yi and Kim, basing its claims primarily on the treasury shares and dividends on them; the formation of

7

the allegedly competing Colorado corporation; the apartment; the consulting fee; the payroll taxes with respect to Kim; the 2008 cross-guarantee; and conspiracy. Yi sought recovery of dividends and other distributions from 2010 to 2013.

At the close of evidence, Kim sought, and the court granted, her motion for nonsuit. The court found there was insufficient evidence to proceed on any theory.

IIG dropped its claims regarding the cross-guarantee and consulting fee. IIG alleged damages involved primarily the unreturned treasury shares ($239,778) and dividends on them ($139,135); $22,947 for the apartment; $5,288 in payroll taxes; and $1.62 million for the creation of the Colorado corporation. Yi sought $334,418 for unpaid dividends and distributions.

The jury returned a special verdict. They concluded Yi owed IIG $401,860 on its claims for fraud, promissory fraud, breach of fiduciary duty, and conversion. This comprises the amount sought by IIG for the treasury shares and dividends on them, plus the corporate apartment. It did not include damages sought for the creation of the Colorado corporation or the $5,288 in payroll taxes. As to the cross-complaint, the jury found IIG owed Yi $122,000, which comprised $45,000 in withheld dividend checks in 2013, and $77,000 for a withheld shareholder tax payment. Judgment was entered.

Both parties filed various posttrial motions. Yi filed a motion for new trial and for JNOV on the complaint, and for motion for new trial on the cross-complaint as to damages. IIG filed a motion for new trial, or in the alternative, remittitur, on its complaint against Yi, and for new trial regarding Kim. The trial court denied all posttrial motions.

8

II

DISCUSSION

A. *Yi's Appeal*

    *1. Standard of Review*

        Most of Yi's arguments on appeal appear to be based on the trial court's denial of his motion for JNOV, which is essentially the same as appealing the judgment itself for a lack of substantial evidence. "A fundamental principle of appellate practice is that an appellant "'must affirmatively show error by an adequate record. . . . Error is never presumed. . . . 'A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent . . . .' [Citation.]" [Citation.]'" (*Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1532-1533; see *State Farm Fire & Casualty Co. v. Pietak* (2001) 90 Cal.App.4th 600, 610.)

        The purpose of a motion for JNOV "'is not to afford a review of the jury's deliberation but to prevent a miscarriage of justice in those cases where the verdict rendered is without foundation.' [Citation.]" (*Sukoff v. Lemkin* (1988) 202 Cal.App.3d 740, 743.)

        When reviewing a JNOV, the appellate court will ordinarily use the same standard the trial court uses in ruling on the motion and determine "whether it appears from the record, viewed most favorably to the party securing the verdict, that any substantial evidence supports the verdict." (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 284.) The trial court properly denies the motion if there is any substantial evidence, or reasonable inferences to be drawn from the evidence, to support the verdict. (*Ibid.*) Our determination with respect to the presence of the requisite substantial evidence is de novo. (*Hirst v. City of Oceanside* (2015) 236 Cal.App.4th 774, 782.)

9

Substantial evidence may be contradicted or uncontradicted. (*Hauter v. Zogarts* (1975) 14 Cal.3d 104, 110.) "'Substantial evidence' is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.) But we do not weigh the evidence or judge the credibility of witnesses. (*Hauter v. Zogarts*, *supra*, 14 Cal.3d at p. 110.)

### 2. Parol Evidence

Yi's primary argument is that evidence of what he told Hu and Lee with respect to the treasury shares was inadmissible parol evidence, because all of the shareholder agreements were integrated contracts, and the oral statements Yi allegedly made contradicted the written terms of those agreements.

The parol evidence rule is a rule of substantive law that prevents the introduction of extrinsic evidence to vary, alter, or contradict the terms of a written agreement. (Code Civ. Proc., § 1856, subd. (a);[3] *Gerdlund v. Electronic Dispensers International* (1987) 190 Cal.App.3d 263, 270.) The operation of the parol evidence rule is a question of law when no evidentiary conflict exists. (*Consolidated World Investments, Inc. v Lido Preferred Ltd.* (1992) 9 Cal.App.4th 373, 378-379.)

Generally, the parol evidence rule states that evidence of an oral agreement inconsistent with a written contract is inadmissible even where the contract is not integrated. This rule is based on sound logic and policy; when a contract is reduced to writing, it is presumed to contain all of the material terms, and it cannot reasonably be presumed that the parties would intend two contradictory terms to be part of the same agreement. (*Gerdlund v. Electronic Dispensers International*, *supra*, 190 Cal.App.3d at p. 271.) Therefore, the parol evidence rule "is not merely a rule of evidence excluding

---

[3] Subsequent statutory references are to the Code of Civil Procedure unless otherwise indicated.

precontractual discussions for lack of credibility or reliability. It is a rule of substantive law making the integrated written agreement of the parties their exclusive and binding agreement *no matter how persuasive the evidence* of additional oral understandings. Such evidence is legally irrelevant and cannot support a judgment. [Citation.]" (*Marani v. Jackson* (1986) 183 Cal.App.3d 695, 701.)

We must first determine whether the shareholder agreements were integrated. A merger clause, such as the one present in each iteration of the shareholder agreement, is generally conclusive on the issue of integration. (*Banco Do Brasil, S.A. v. Latian, Inc.* (1991) 234 Cal.App.3d 973, 1001.) The 2007 agreement, for example, states: "This instrument constitutes the entire Shareholder Agreement . . . and correctly sets forth the rights, duties, and obligations of each Shareholder . . . . Any prior agreements, promises, negotiations, or representations concerning the Agreement's subject matter not expressly set forth in this Agreement are of no force or effect." The 2008 agreement includes a substantively similar clause, as does the 2009 amendment.

As to whether the documents vary, alter, or contradict the terms of a written agreement, the statements Yi made to Hu and Lee, and the existence of the treasury shares themselves, are contradicted by the written agreements in several ways. The agreements each specify the percentage of shares owned by each investor; there is no mention of IIG owned treasury shares. The 2007 agreement states that written approval of all shareholders is needed to approve the issuance of "shares of any class or other rights relating to the issuance of shares of the Corporation." The 2008 agreement, and the 2009 amendment, specifically states the shares listed by percentage to each shareholder "constitute all of the issued and outstanding capital stock of the corporation."

IIG does not contest the existence of integrated agreements. It argues instead that an exception to the parol evidence rule permits the introduction of extrinsic evidence to establish fraud. The fraud exception to the parol evidence rule is codified at section 1856, subdivision (g): "This section does not exclude other evidence of the

11

circumstances under which the agreement was made or to which it relates, as defined in Section 1860, or to explain an extrinsic ambiguity or otherwise interpret the terms of the agreement, or to establish illegality or fraud."

Not long ago, in *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169 (*Riverisland*), the California Supreme Court overruled *Bank of America etc. Assn. v. Pendergrass* (1935) 4 Cal.2d 258 (*Pendergrass*). *Pendergrass* had limited the fraud exception to the parol evidence rule by requiring that evidence offered to prove fraud "must tend to establish some independent fact or representation, some fraud in the procurement of the instrument or some breach of confidence concerning its use, and not a promise directly at variance with the promise of the writing." (*Id.* at p. 263.) Thus, under *Pendergrass*, external evidence of promises inconsistent with the express terms of a written contract were not admissible, even to establish fraud.

In *Riverisland,* the plaintiffs appealed after a grant of summary judgment. The plaintiffs alleged they negotiated an agreement to restructure their debt to a production credit association. They alleged the credit association's representative told them that their loan would be extended for two years in exchange for additional collateral consisting of two ranches. These assurances were repeated when they signed the restructuring agreement, which they signed without reading. The agreement, however, provided only three months of forbearance and identified eight parcels as additional collateral. (*Riverisland*, *supra*, 55 Cal.4th at p. 1173.)

The plaintiffs sued for fraud, negligent misrepresentation, rescission and reformation of the agreement. The trial court granted summary judgment on the ground the fraud exception to the parol evidence rule did not allow admission of promises at odds with the terms of a written agreement. (*Riverisland*, *supra*, 55 Cal.4th at p. 1173.) The essential basis of the plaintiffs' claims was that the written agreement did not reflect the actual agreement between the parties. (*Ibid.*)

12

The California Supreme Court disagreed with the trial court's ruling. "Despite the unqualified language of section 1856, which broadly permits evidence relevant to the validity of an agreement and specifically allows evidence of fraud, the *Pendergrass* court decided to impose a limitation on the fraud exception. The facts of *Pendergrass* are similar in certain respects to those here. Borrowers fell behind on their payments. They and the bank executed a new promissory note, which was secured by additional collateral and payable on demand. Soon after it was signed, the bank seized the encumbered property and sued to enforce the note. In defense, the borrowers claimed the bank had promised not to interfere with their farming operations for the remainder of the year, and to take the proceeds of those operations in payment. They alleged that the bank had no intention of performing these promises, but made them for the fraudulent purpose of obtaining the new note and additional collateral. [Citation.]" (*Riverisland*, *supra*, 55 Cal.4th at p. 1175.)

The court, after extensively reviewing the holding of *Pendergrass* and the reactions to it over the years, reasoned: "There are multiple reasons to question whether *Pendergrass* has stood the test of time. It has been criticized as bad policy. Its limitation on the fraud exception is inconsistent with the governing statute, and the Legislature did not adopt that limitation when it revised section 1856 based on a survey of California case law construing the parol evidence rule. *Pendergrass's* divergence from the path followed by the Restatements, the majority of other states, and most commentators is cause for concern, and leads us to doubt whether restricting fraud claims is necessary to serve the purposes of the parol evidence rule." (*Riverisland*, *supra*, 55 Cal.4th at pp. 1179-1180.) In addition to other issues with *Pendergrass,* the court noted that cases predating it had routinely stated that parol evidence was admissible to prove fraud. One such case, *Ferguson v. Koch* (1928) 204 Cal. 342, 347, stated: "[I]t was never intended that the parol evidence rule should be used as a shield to prevent the proof of fraud."

13

"Accordingly, we conclude that *Pendergrass* was an aberration. It purported to follow section 1856 [citation], but its restriction on the fraud exception was inconsistent with the terms of the statute, and with settled case law as well. *Pendergrass* failed to account for the fundamental principle that fraud undermines the essential validity of the parties' agreement. When fraud is proven, it cannot be maintained that the parties freely entered into an agreement reflecting a meeting of the minds. Moreover, *Pendergrass* has led to instability in the law, as courts have strained to avoid abuses of the parol evidence rule. The *Pendergrass* court sought to '"prevent frauds and perjuries"' [citation], but ignored California law protecting against promissory fraud. The fraud exception has been part of the parol evidence rule since the earliest days of our jurisprudence, and the *Pendergrass* opinion did not justify the abridgment it imposed. For these reasons, we overrule [*Pendergrass*], and its progeny, and reaffirm the venerable maxim stated in *Ferguson v. Koch*. . . : '[I]t was never intended that the parol evidence rule should be used as a shield to prevent the proof of fraud.'" (*Riverisland*, *supra*, 55 Cal.4th at p. 1182.)

Yi argues that *Riverisland* applies only where the validity of the agreement is at issue, which would limit it to breach of contract cases seeking to rescind the agreement. Yi cites two cases interpreting *Riverisland* to support his contention: *Julius Castle Restaurant, Inc. v. Payne* (2013) 216 Cal.App.4th 1423 (*Julius Castle*), and *Thrifty Payless, Inc. v. The Americana at Brand, LLC* (2013) 218 Cal.App.4th 1230 (*Thrifty Payless*). Both of these cases were landlord/tenant disputes involving integrated lease agreements. In *Julius Castle*, the plaintiffs signed a lease to operate a restaurant in San Francisco. They inspected the property and carefully considered and negotiated the terms of the lease, but the Court of Appeal nonetheless ruled that evidence that the lessors made oral representations contrary to the terms of the contract were admissible under the fraud exception to the parol evidence rule. (*Julius Castle*, *supra*, 216 Cal.App.4th at pp. 1439-1440.) "Defendants also argue that *Riverisland* and the authorities it cites 'require that

14

the circumstances of each case and the bargaining power of [each party] be considered.' Defendants also claim that 'inquiry into the relative sophistication of the parties is simple.' Perhaps. In our view, however, our high court sought the opposite result, namely, to create certainty and consistency by eliminating altogether the judicially created exception to section 1856, subdivision (g)." (*Id.* at p. 1441.) The court suggested that after *Riverisland*, the parties in a fraud action would be better served by focusing on addressing other elements of that tort, including the heightened pleading requirements and the element of justifiable reliance. (*Id.* at pp. 1441-1442.)

In *Thrifty Payless*, the landlord provided estimates to the tenant regarding its likely share of common area expenses during lease negotiations, but the estimates were not included in the lease. The tenant's share turned out to be higher, and the tenant sued for fraud, alleging the landlord knew the common area expenses were material to the tenant and intentionally and negligently misrepresented them. (*Thrifty Payless*, *supra*, 218 Cal.App.4th at pp. 1234-1236.) The landlord's demurrer, in part, argued that the parol evidence rule prohibited evidence of its "'estimates.'" (*Id.* at p. 1237.)

Reversing the trial court's decision, the Court of Appeal concluded: "Here, under *Riverisland* . . . extrinsic evidence is admissible to establish fraud or negligent misrepresentation in the face of the lease's integration clause. Thus, Thrifty can allege both intentional and negligent misrepresentations based upon Americana's grossly inaccurate estimates." (*Thrifty Payless*, *supra*, 218 Cal.App.4th at pp. 1241-1242, fn. omitted.)

Neither of these cases support Yi's assertion that evidence of fraud is only admissible in cases where the validity of the agreement is at issue. The plaintiffs in *Julius Castle* did not seek to rescind the contract for invalidity; they sued for breach of contract (and lost) and for fraud (intentional and negligent misrepresentation), and won. (*Julius Castle*, *supra*, 216 Cal.App.4th at p. 1441.) The plaintiff in *Thrifty Payless* sought

15

damages and rescission of the lease in its complaint, but the court said nothing about limiting the use of the parol evidence to the rescission claim.

Indeed, such an argument seems to us to contradict *Riverisland* itself. It simply seems to partly restate the *Pendergrass* rule that evidence of fraud "must establish . . . *some fraud in the procurement of the instrument* . . . and not a promise directly at variance with the promise of the writing." (*Pendergrass*, *supra*, 4 Cal.2d at p. 263, italics added.) While the court noted in *Riverisland* that if "fraud is proven, it cannot be maintained that the parties freely entered into an agreement reflecting a meeting of the minds" (*Riverisland*, *supra*, 55 Cal.4th at p. 1182), the court said nothing about limiting its holding to cases where rescission or voiding the contract was the only remedy sought. What it did say was that "*Pendergrass* was an aberration. . . . [I]ts restriction on the fraud exception was inconsistent with the terms of the statute, and with settled case law as well." (*Ibid.*) "The fraud exception has been part of the parol evidence rule since the earliest days of our jurisprudence, and the *Pendergrass* opinion did not justify the abridgment it imposed." (*Ibid.*)

Accordingly, we find the overriding concern expressed by the court was that the *Pendergrass* rule, "while intended to prevent fraud, . . . may actually provide a shield for fraudulent conduct." (*Riverisland*, *supra*, 55 Cal.4th at p. 1172.) The court's intention in *Riverisland* was to bring its case law into line with section 1856, subdivision (g), which states: "this section does not exclude other evidence . . . to establish . . . fraud." As the court noted, in *Riverisland* "[c]onspicuously omitted was any mention of *Pendergrass* and its nonstatutory limitation on the fraud exception." (*Id.* at p. 1179.)

Therefore, we decline to give *Riverisland* the narrow reading Yi advances. Although IIG was not attempting to rescind the shareholder agreements, it set out to prove that Lee and Hu had entirely different understandings about the meaning of those agreements based on Yi's allegedly fraudulent misrepresentations. We conclude the statements were admissible to prove fraud, and the jury apparently found the testimony of

Lee and Hu credible. Accordingly, we find the court did not err by denying Yi's motion for JNOV on this basis.[4] We also need not consider Yi's argument that the jury's verdict cannot stand in the absence of the parol evidence.

### 3. Other Issues Relating to Substantial Evidence

Yi next raises a potpourri of issues regarding the purported lack of substantial evidence. He first claims that his stock certificate, if restricted, was required to so state under Corporations Code section 418. The certificate he points us to is dated June 2012. The testimony he cites from Hu and Lee relates to events far earlier. This certificate alone is insufficient to call into doubt the existence of substantial evidence on all causes of action. The jury was free to give the stock certificate the weight it deemed appropriate.

Next, Yi asserts that IIG introduced evidence that contradicted its discovery admissions and pleading. IIG alleged in its complaint that Yi's fraudulent misrepresentations and promises relating to the 10,000 treasury shares occurred in December 2010, and gave the same date in an interrogatory response. December 2010 was the date that Hu and Lee asked Yi to return the treasury stock and he refused, not the date of the initial misrepresentations, which occurred in 2007. Yi therefore claims this inconsistency somehow utterly defeats IIG's fraud claim. Yi is mistaken, and the cases he cites, which are mostly in the summary judgment context, do not say otherwise. Yi was well aware of IIG's contention regarding the misrepresentations, and this blatant attempt at a "gotcha!" is beneath the dignity of further analysis.

Yi also offers analysis as to each cause of action that was purportedly lacking in substantial evidence. Because the damages were the same as to IIG's causes of

___

[4] For the same reason, we also reject Yi's assertion that the extrinsic evidence of fraud is not "relevant," which is essentially the parol evidence argument wearing a different sweater.

action for breach of fiduciary duty, fraud, and false promise, we need only find there was substantial evidence of one of IIG's claims to conclude the motion for JNOV was properly denied. The most straightforward road is that of breach of fiduciary duty. "The elements of a cause of action for breach of fiduciary duty are: (1) the existence of a fiduciary duty; (2) the breach of that duty; and (3) damage proximately caused by that breach. [Citation.]" (*Mosier v. Southern Cal. Physicians Ins. Exchange* (1998) 63 Cal.App.4th 1022, 1044.)

Yi does not argue there was no substantial evidence of breach of fiduciary duty as to either the apartment or the payroll taxes, leaving us with the issue of the treasury shares. It is undisputed that Yi was a corporate director and officer of IIG, and therefore had a fiduciary duty to the corporation. (Corp. Code, § 309; *Berg & Berg Enterprises, LLC v. Boyle* (2009) 178 Cal.App.4th 1020, 1037.) There was substantial evidence at trial that Yi misrepresented to his fellow shareholders that MetroPCS required him to be majority shareholder, thereby persuading them to give him additional shares. While Hu and Lee understood these shares would be treasury shares, owned by the corporation, Yi subsequently acted as if the shares were his personally, and refused to return them. These actions caused the corporation harm by forcing IIG to eventually buy the shares back, to its financial detriment.

As we noted above, it does not matter that there was evidence that contradicts the version of events set forth above. The evidence presented at trial was solid, reasonable, and credible, and therefore met the legal definition of substantial evidence to support the judgment. The court did not err by denying Yi's motion for JNOV.

18

### 4. *Purported Trial Errors*

Yi next raises numerous issues he claims cumulatively prejudiced him, requiring a new trial.[5] We review these for abuse of discretion. "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason." (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478-479.)

First, Yi contends that IIG's counsel committed misconduct during closing argument. "In conducting closing argument, attorneys for both sides have wide latitude to discuss the case. "'"The right of counsel to discuss the merits of a case, both as to the law and facts, is very wide, and he has the right to state fully his views as to what the evidence shows, and as to the conclusions to be fairly drawn therefrom. The adverse party cannot complain if the reasoning be faulty and the deductions illogical, as such matters are ultimately for the consideration of the jury."'" [Citations.] "Counsel may vigorously argue his case and is not limited to 'Chesterfieldian politeness.'" [Citations.] "An attorney is permitted to argue all reasonable inferences from the evidence, . . ." [Citation.] "Only the most persuasive reasons justify handcuffing attorneys in the exercise of their advocacy within the bounds of propriety." [Citation.]' [Citation.]" (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 795-796 (*Cassim*).)

Yi claims counsel committed misconduct by arguing, as Yi puts it, that "Yi was hiding money from his wife by giving it to his girlfriend." This mischaracterizes counsel's statement: "Now, what else is happening at the company while all of this is going on? Because there are other things happening at the company. And one of the things that's happening . . . is Mr. Yi's going through a divorce. And as part of that divorce, his . . . soon-to-be ex-wife Ms. Yun Sun Yi is trying to find out about his assets;

---

[5] In his introduction to this section, Yi throws out a number of other alleged evidentiary errors, but does not expand on them or offer specific argument supported by authority. Any purported error not developed with argument and legal authority is waived. (*Kurinij v. Hanna & Morton* (1997) 55 Cal.App.4th 853, 865.)

she's trying to find out how much money he has, and she's trying to find out what his companies are worth." This statement was also supported by evidence in the record. We find no error.

Yi did not object to any further statements during this portion of counsel's argument, and despite his assertion to the contrary, we see no reason why he could not make further objections or request admonitions he deemed appropriate. (See *Cassim*, *supra*, 33 Cal.4th at pp. 794-795.)

Yi states that counsel, later in his argument, improperly said the jury "should disregard IIG's evidentiary and discovery admissions that Yi made his misrepresentation and promises in 2010 that contradicted the testimony from Hu and Lee because the admissions were based on his mistake – his 'typo.'" Essentially, Yi asserts counsel was attempting to take responsibility for any error with respect to an inconsistent date in IIG's discovery responses. The court sustained Yi's objection, telling counsel he was not entitled to testify. The court had already instructed the jury on the importance of discovery responses, emphasizing they were given under oath and had the same import as if the answers were given in court. Yi did not request any further admonition or instruction, and there is nothing in the record he had no opportunity to make such a request. Accordingly, any error is waived. (*Cassim*, *supra*, 33 Cal.4th at pp. 794-795.)

Yi's next claim of error is a one-paragraph argument that the court improperly admitted Hu's statement that Yi's ex-wife "knew all about the treasury shares." His entire argument is: "If the jury had any issue with the credibility between the parties, IIG was allowed to tell the jury that a non-party knew all about the treasury shares, so why should they believe Yi's testimony that none existed." He claims this "irreparably prejudiced" his case (without authority or analysis). IIG responds that the statement, as the trial court concluded, was not admitted for its truth, but for the effect it had on Hu. This was a proper use of the statement, and therefore we find no error.

20

Yi also complains the court, over an Evidence Code section 352 objection, allowed IIG to ask him whether he was over $100,000 in arrears in child support. The court overruled the objection, asked Yi whether he was in arrears without stating the amount, and instructed counsel to move on. This evidence was offered in response to Yi's statement during direct examination, in response to a question about why he stopped attending shareholder and board meetings, that the "only thing that mattered to me the most was . . . [to] provide for … my other two children from my previous marriage." Thus, the question was offered to rebut Yi's assertion about what was important to him, thereby calling into doubt the credibility of his testimony about why he stopped attending IIG meetings. While undoubtedly prejudicial, it was not unduly prejudicial, and therefore it was within the court's discretion to admit this statement.

Finally, Yi asserts misconduct by the trial judge by offering a laundry list of purportedly biased statements and "examining" Yi. We need not list the statements here; we have reviewed them, and taken together or separately, they reflect no bias or other improper conduct. Although at some points the court's statements reflect frustration with Yi's conduct, such as admonishing him for answering before the court could rule on an objection by opposing counsel, there is no support in the record that anything the court said "fatally tainted Yi," as he asserts. Moreover, there is nothing in the record to suggest that Yi was treated differently than any other key witness; the court was equally pointed toward both Hu and Lee. The court's conduct was well within the scope of proper administration during a complicated trial.

Given that we find no error here, we need not address Yi's claims regarding cumulative error.

### 5. *Adequacy of Damages on Yi's Cross-Complaint*

Yi also appeals the amount of damages awarded on his cross-complaint, asserting the $122,000 the jury found appropriate is "insufficient as a matter of law."

21

"The question as to the amount of damages is a question of fact. In the first instance, it is for the jury to fix the amount of damages, and secondly, for the trial judge, on a motion for a new trial, to pass on the question of adequacy. Whether the contention is that the damages fixed by the jury are too high or too low, the determination of that question rests largely in the discretion of the trial judge. The appellate court has not seen or heard the witnesses, and has no power to pass upon their credibility. Normally, the appellate court has no power to interfere except when the facts before it suggest passion, prejudice or corruption upon the part of the jury, or where the uncontradicted evidence demonstrates that the award is insufficient as a matter of law. In determining whether there has been an abuse of discretion, the facts on the issue of damage most favorable to the respondent must be considered. [Citations.]" (*Gersick v. Shilling* (1950) 97 Cal.App.2d 641, 645.)

As was explained at trial, the damages Yi sought can essentially be broken into three categories: 1) Unpaid, declared dividends from September through December 2013, totaling $45,000; 2) Tax liability for 2013 of $77,000; and 3) Dividends that IIG did not declare for 2010-2013, but should have. The $122,000 awarded by the jury reflects $45,000 from the first category and $77,000 from the second category.[6] The parties appear to agree this is what the jury awarded, while refusing to award any damages from the third category of undeclared dividends.

---

[6] IIG does not dispute the $45,000 from the first category. IIG does purport to contest the award of $77,000, but it is not appropriate to do so in a respondent's brief. IIG should have included this amount, if it wished to argue it, in its cross-appeal. (§ 906 ["The provisions of this section do not authorize the reviewing court to review any decision or order from which an appeal might have been taken"].) Rather, IIG, in its opening cross-appellant's brief, raises only the issue of whether the expert's testimony on this point was admissible. It attempts to muddy the waters by addressing issues of substantial evidence in its cross-reply brief, but this, too, is improper. (See *Schubert v. Reynolds* (2002) 95 Cal.App.4th 100, 108-109.) Thus, the only issue we properly address with respect to the $77,000 in tax liability is whether the expert's testimony was properly admitted, and we shall do so in the context of the cross-appeal.

As noted above, damages are only insufficient if the "uncontradicted evidence demonstrates that the award is insufficient as a matter of law." (*Gerlick v. Shilling*, *supra*, 97 Cal.App.2d at p. 645.) The evidence here was disputed. Yi's expert and IIG's expert gave conflicting testimony as to whether IIG's practice prior to 2013 had been to issue dividends. Yi's expert conceded there was no standard accounting practice or guideline regarding how much a corporation had to pay its shareholders in a given year, or whether the amount paid was required to match the amount listed on the IRS K-1 schedule. She testified as to what was "common in the industry," as to what was a "business practice," IIG's expert testified that no such business practice existed with respect to the majority of businesses he had worked with. But Yi's expert did not testify as to what IIG actually did. She testified she was basing her testimony on historical evidence that IIG had agreed to pay dividends.

The jury was instructed, and the law is that "directors of a corporation alone have the power to determine, within their sound discretion, if, when, and how much of a dividend will be paid. [¶] . . . A declaration or authorization for a dividend must be for a specified amount . . . ." There was an obvious conflict of evidence, as to whether IIG had authorized such dividends, and in what amounts, for the years prior to 2013. Yi argues that because the jury accepted his argument with respect to unpaid dividends for 2013, it automatically followed that the jury must accept the same argument as to the prior years. The difference is that the 2013 dividends were expressly reflected in an April 2013 board resolution. This makes those dividends fundamentally different from alleged dividends from previous years, which were not reflected in board minutes offered at trial.

Accordingly, given the disputed evidence, we conclude Yi has not met the high standard to demonstrate inadequate damages, and we find no error.

*B. IIG's Cross-Appeal*

IIG's cross-appeal pertains primarily to Kim's eventual dismissal from the case. It also contends that the testimony of Yi's accounting expert should not have been admitted to establish that IIG owed Yi $45,000 in tax liability for the year 2013. We address each contention in turn.

*1. Nonsuit as to Conversion*

A defendant is entitled to a nonsuit if the trial court determines the evidence presented by plaintiff is insufficient to permit a jury to find in his or her favor as a matter of law. (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291.) "In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded." (*Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 118.) The plaintiff's evidence, however, must have substance upon which reasonable minds can differ; evidence that raises mere conjecture or speculation is insufficient. (*Abreu v. Svenhard's Swedish Bakery* (1989) 208 Cal.App.3d 1446, 1457.) The same standard applies on appeal. (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1214-1215.)

""""Conversion is the wrongful exercise of dominion over the property of another. The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages. . . ."""" (*Welco Electronics, Inc. v. Mora* (2014) 223 Cal.App.4th 202, 208.)

IIG makes the mistake of relying nearly entirely on acts by Yi to support its claim that Kim committed conversion. IIG argues: "At trial, IIG presented evidence that Yi caused IIG to put Kim (at that time, Yi's girlfriend) on payroll even though Kim was not an employee and did not perform any work for IIG. The payments were classified as

'payroll' or 'bonus.' Yi did so without the knowledge of IIG's other Directors or shareholders, by directing IIG's Controller, Cheon, to contact the payroll processing company to 'convert' Yi's dividend payments to Kim's name. As a result, IIG had to pay W-2 wages to Kim, plus state and federal payroll taxes which it would not otherwise have been required to make. [¶] IIG contended that the money paid to Kim did not rightly belong to Kim, and instead belonged to IIG. IIG further contended that the money did not belong to Yi because he was not entitled to it as, during the period, he was in breach of his fiduciary duties to IIG. The money was not otherwise payable to Yi as wages or 'regular' compensation, but rather as a 'bonus.' Accordingly, Yi was not entitled to this money and IIG was entitled to it."

In sum, IIG wants to hold Kim liable for conversion because Yi told Cheon (who was indisputably a shareholder as well as a controller, belying the claim that no other shareholders were aware of this) to "convert" Yi's dividends to payroll payments to Kim. IIG claims that Yi was not entitled to this money because he was in breach of his fiduciary obligations at the time, citing cases where, it claims, an employer was able to recover salary or bonuses from a faithless employee as damages or restitution. The applicability of some of these authorities here is questionable. But the ability to recover later does not establish *conversion* at the time the money was paid, and IIG's authorities do not state otherwise. Further, the trial court rejected IIG's request for restitution at trial, and the jury was never instructed on this theory – a ruling from which IIG does not appeal. We conclude, therefore, that at the time the sums were paid to Kim, there was no substantial evidence from which a jury could conclude those funds did not belong to Yi.

25

If Yi did not wrongfully instruct Cheon to redirect the funds, there can be no conversion on Kim's part.[7]

### 2. *Nonsuit as to Civil Conspiracy*

IIG next contends the court should not have granted a nonsuit on IIG's claim of civil conspiracy as to Kim, and the jury should have determined whether she conspired with Yi to commit conversion or fraud.

Conspiracy is not a separate tort, but a form of vicarious liability by which one defendant can be held liable for the acts of another. (*De Vries v. Brumback* (1960) 53 Cal.2d. 643, 650; *Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571, 1581.) To establish conspiracy, a plaintiff must allege that the defendant had knowledge of and agreed to both the objective and the course of action that resulted in the injury, that there was a wrongful act committed pursuant to that agreement, and that there was resulting damage. (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 47.) A conspiracy requires evidence "that each member of the conspiracy acted in concert and came to a mutual understanding to accomplish a common and unlawful plan, and that one or more of them committed an overt act to further it." (*Choate v. County of Orange* (2000) 86 Cal.App.4th 312, 333.) Thus, conspiracy provides a remedial measure for affixing liability to all who have "agreed to a common design to commit a wrong" when damage to the plaintiff results. (*Agnew v. Parks* (1959) 172 Cal.App.2d 756, 762.)

---

[7] As to the withheld taxes, IIG argues in its reply that these were recoverable from Kim under a conversion theory as reasonably foreseeable "special damages." It is inappropriate to raise this argument for the first time in a reply brief, something IIG does more than once in its cross-appeal. We decline to consider it further. (See *Schubert v. Reynolds*, *supra*, 95 Cal.App.4th at pp. 108-109.)

26

The defendant in a conspiracy claim must be capable of committing the target tort. (*Casey v. U.S. Bank Nat. Assn.* (2005) 127 Cal.App.4th 1138, 1145, fn. 2.)[8]

As it did with respect to the conversion claim, IIG again focuses on what Yi did and said to establish that Kim committed a tort against it. Here, IIG argues: "Yi was a member of IIG's Board of Directors and knew that IIG was interested in expanding to other markets, including Colorado and that IIG was financially capable of doing so. Yi learned of the business opportunity in the Colorado market but did not present the opportunity to IIG. Instead, Yi brought the opportunity to Kim, who formed a Colorado corporation and began operations as a MetroPCS® authorized retailer, i.e. the same business as IIG. The business was also called Unlimited PCS, Inc., which at the time was the name IIG was still using. The new company was formed in Kim's name, and Yi was kept off corporate filings. In fact, however, Yi was a member of the Board of Directors, Chairman of the Board, President, and CEO, and Yi remained President and CEO from the time of the inception of the corporation onwards. Yi's testimony was that he did not own shares in the Colorado corporation and worked without pay."

Assuming all of these facts are true, as we must for purposes of reviewing a grant of a nonsuit, IIG still fails to present any evidence that Kim had knowledge of and agreed to both the objective and the course of action that resulted in the injury. (*Quelimane Co. v. Stewart Title Guaranty Co.*, *supra*, 19 Cal.4th at p. 47.) This means that Kim must have known more than that Yi was forming a new company with her; it must be proved that she did so with knowledge of both the conversion and fraud that Yi purportedly engaged in. (See *Choate v. County of Orange*, *supra*, 86 Cal.App.4th at p. 333 [conspiracy requires mutual understanding to accomplish an unlawful plan].) The

---

[8] Because Kim was not capable of committing a breach of fiduciary duty against a company she was not in a fiduciary relationship with, IIG does not contest that Kim could not be liable for conspiring to commit a breach of fiduciary duty.

record is bereft of any facts from which the court could have drawn the inference that Kim, who apparently did not testify at trial, had the requisite knowledge and intent.

### 3. *Leave to Amend to Allege Aiding and Abetting as to Kim*

Toward the close of trial, and after Kim had moved for nonsuit, IIG requested leave to amend its complaint to include an aiding and abetting breach of fiduciary duty claim as to Kim to "conform to proof." The court denied the motion. We review for abuse of discretion. (*Branick v. Downey Savings & Loan Assn.* (2006) 39 Cal.4th 235, 242.)

Motions for leave to amend are left to the sound discretion of the trial judge: "The court may, in furtherance of justice, and on any terms as may be proper, allow a party to amend any pleading . . . ." (§ 473, subd. (a)(1).) While the court's discretion on this matter is generally exercised broadly, "'"[t]he exercise of that discretion will not be disturbed on appeal absent a clear showing of abuse."'" (*Branick v. Downey Savings & Loan Assn.*, *supra*, 39 Cal.4th at p. 242.)

Amendments are permitted even after trial begins. (§ 576.) "The cases on amending pleadings during trial suggest trial courts should be guided by two general principles: (1) whether facts or legal theories are being changed and (2) whether the opposing party will be prejudiced by the proposed amendment. Frequently, each principle represents a different side of the same coin: If new facts are being alleged, prejudice may easily result because of the inability of the other party to investigate the validity of the factual allegations while engaged in trial or to call rebuttal witnesses. If the same set of facts supports merely a different theory . . . no prejudice can result." (*City of Stanton v. Cox* (1989) 207 Cal.App.3d 1557, 1563.) Leave to amend is properly denied, however, "where the facts are not in dispute, and the nature of the plaintiff's claim is clear, but under substantive law, no liability exists and no amendment would change the result." (*Edwards v. Superior Court* (2001) 93 Cal.App.4th 172, 180.)

28

California's law on subjecting a defendant to liability for aiding and abetting a tort arises from common law. "'Liability may . . . be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person.' [Citations.]" (*Fiol v. Doellstedt* (1996) 50 Cal.App.4th 1318, 1325-1326.)

As we have already discussed, there was insufficient evidence to hold Kim liable for civil conspiracy. "Despite some conceptual similarities, civil liability for aiding and abetting the commission of a tort, which has no overlaid requirement of an independent duty, differs fundamentally from liability based on conspiracy to commit a tort. [Citations.] '"Aiding-abetting focuses on whether a defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct, not on whether the defendant agreed to join the wrongful conduct." [¶] . . . [W]hile aiding and abetting may not require a defendant to agree to join the wrongful conduct, it necessarily requires a defendant to reach a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act.'" (*Berg & Berg Enterprises, LLC v. Sherwood Partners, Inc.* (2005) 131 Cal.App.4th 802, 823, fn. 10.)

"California courts have long held that liability for aiding and abetting depends on proof the defendant had *actual knowledge of the specific primary wrong* the defendant substantially assisted." (*Casey v. U.S. Bank Nat. Assn.*, *supra*, 127 Cal.App.4th at pp. 1145-1146, italics added.) In this case, that would be actual knowledge of Yi's breach of fiduciary duty by starting the new business with Kim in Colorado in 2013. IIG does not point to anywhere in the record where it identified the specific facts to the court upon which it would rest a claim of aiding and abetting. And in its briefs here, the facts IIG sets forth do not support an argument that Kim knew or

29

reached a conscious decision that she was assisting Yi to breach his fiduciary duty, nor do the facts IIG offers support such an inference. Again, IIG focuses on Yi's acts, not Kim's. Indeed, IIG does not anywhere assert that Kim had any knowledge of Yi's wrongdoing or intent to engage in wrongdoing herself. The closest IIG comes is an assertion that "IIG contended that the clear inference [from the testimony regarding Yi's acts] was that Kim's involvement was a smokescreen meant to shield Yi's involvement from scrutiny." But this comes nowhere close to establishing Kim's wrongful intent – it could just as easily mean that she was never informed by Yi of the full facts surrounding the Colorado corporation. Accordingly, IIG has not provided sufficient evidence that any liability on Kim's part exists here, and therefore the court did not err by denying IIG leave to amend. (*Edwards v. Superior Court*, *supra*, 93 Cal.App.4th at p. 180.)

### 4. *Expert Testimony on Tax Liability*

One of Yi's claims in his cross-complaint was that IIG was required to pay Yi, as a shareholder, $77,000 to cover a tax liability in 2013. Yi offered the testimony of an expert witness, who testified this was a common business practice. IIG asserts the court incorrectly admitted this testimony.

The trial court rejected IIG's argument below, stating that it would admit the testimony of both Yi's and IIG's experts on this point, and instruct the jury accordingly that the experts' opinions were only as good as their assumptions. The jury could consider those assumptions, the court decided, as a question of fact. "Trial court rulings on the admissibility of evidence, whether in limine or during trial, are generally reviewed for abuse of discretion. [Citations.]" (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317.)

30

On appeal, however, IIG offers no argument that the erroneous admission of this evidence was so prejudicial that reversal is required.[9] "A judgment of the trial court may not be reversed on the basis of the erroneous admission of evidence, unless that error was prejudicial. (Code Civ. Proc., § 475.)" (*Grail Semiconductor, Inc. v. Mitsubishi Electric & Electronics USA, Inc.* (2014) 225 Cal.App.4th 786, 799.) "The record must show that the appellant 'sustained and suffered substantial injury, and that a different result would have been probable if such error . . . had not occurred or existed. There shall be no presumption that error is prejudicial, or that injury was done if error is shown.' [Citation.] Additionally, article VI, section 13, of the California Constitution provides that a judgment may not be set aside based on the erroneous admission of evidence 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' Evidence Code section 353 reinforces that provision: we may not reverse a judgment by reason of the erroneous admission of evidence unless . . . [¶] . . . [¶] . . . the error or errors complained of resulted in a miscarriage of justice.' [Citation.]" (*Ibid.*)

IIG comes nowhere close to clearing this exceedingly high bar. Other than a bare assertion of prejudice in its reply brief, IIG offers no mention at all as to why or how this testimony was so prejudicial that a reversal is necessary. It fails to support, with evidence, that this testimony was so damaging that in its absence, a different result was probable. Accordingly, even if we agreed with IIG that this evidence should not have been admitted, IIG has failed to demonstrate the requisite prejudice to justify reversal and a new trial solely on this basis.

---

[9] For the first time in its cross-reply brief, IIG introduces several new arguments beyond the admissibility of this evidence itself, including claiming that if the expert's testimony meant what Yi claimed, it did not support any award in Yi's favor and that Yi was never owed a debt for the funds to cover a tax liability in any event. See footnote seven for the reasons we will not be addressing these issues.

III

DISPOSITION

The judgment is affirmed.  Each party shall bear its own costs on appeal.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


GOETHALS, J.

Filed 4/23/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| IIG WIRELESS, INC.,<br><br>   Plaintiff, Cross-defendant and Appellant,<br><br>      v.<br><br>JOHN YI,<br><br>   Defendant, Cross-complainant and Appellant;<br><br>LAUREN KIM,<br><br>    Defendant and Respondent. | G053393<br><br>(Super. Ct. No. 30-2013-00690040)<br><br>ORDER GRANTING REQUEST FOR PUBLICATION |

Attorney Matthew L. Eanet, counsel for IIG Wireless, Inc., has requested that our opinion filed on March 27, 2018, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED.

The opinion is ordered published in the Official Reports.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


GOETHALS, J.