Filed 3/16/23  Reed v. Sylk CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| DIANE REED, | |
| Plaintiff and Appellant, | E077267 |
| v. | (Super. Ct. No. PSC1801926) |
| ROBERT SYLK, | OPINION |
| Defendant and Respondent. | |

APPEAL from the Superior Court of Riverside County.  David M. Chapman, Judge.  Affirmed.

The Appellate Law Firm, Aaron Myers and Mark Kuntze, for Plaintiff and Appellant.

Fromberg Edelstein & Fromberg and Mark W. Edelstein, for Defendant and Respondent.

## I.

## INTRODUCTION

Plaintiff and Appellant, Diane Reed entered into a written contract with defendant

1

and respondent, Robert Sylk. They agreed Sylk would provide Reed with contacts who might fund her prospective business venture. In return, Reed paid Sylk a non-refundable $15,000 fee. Although Sylk introduced Reed to several prospective lenders, Reed ultimately did not receive any money or loans needed to fund her business venture. Reed sued Sylk and his business partner, John Dunn, for damages and injunctive relief, claiming (1) violations of Business and Professions Code section 17200 (unfair and fraudulent business practices), (2) fraud, and (3) financial elder abuse.

Reed appeals from a defense judgment entered in favor of Sylk, following a court trial.[1] Reed contends the trial court erred in sustaining defense counsel's parol evidence objection to Reed testifying regarding statements Sylk made when Reed entered into the contract. Reed also argues the trial court abused its discretion by excluding evidence that Sylk was unable to secure for himself a $35,000 personal loan. We reject Reed's contentions and affirm the judgment.

II.

FACTS AND PROCEDURAL BACKGROUND

A. *Reed's Complaint Allegations*

On April 4, 2018, Reed filed a complaint for damages and injunctive relief against Reed and John Dunn (Defendants). In her amended complaint, Reed alleged that in January 2014, she called Sylk and asked him if he knew of someone who could help her

---

[1] Before trial, Dunn entered into a settlement agreement with Reed and was dismissed from the case with prejudice.

with her business plan for a health spa business. During the conversation, Sylk "indicated that if [Reed] needed money for the business, then he could get [her] a $10 million loan through wealthy investors if [she] provided an upfront $15,000 payment."

Reed and Sylk entered into a written contract (Contract) in March 2014, which allegedly provided that Sylk would receive a non-refundable $100,000 retainer fee, with $15,000 paid by Reed as an up-front, non-refundable retainer fee and $85,000 to be paid at closing of the loan. Under the Contract, Sylk was also to be paid seven percent of the gross loan. Reed paid Sylk the $15,000 non-refundable retainer fee and Sylk introduced Reed to a couple of potential investors and lenders, including Timothy Coffin of Eastgate Capital.

Coffin sent Sylk a document, which Sylk forwarded to Reed, indicating Eastgate Capital had the "ability to fund a $10,000,000 loan upon approval from the company's underwriting department and proof of $150,000 in liquid funds." Sylk advised Reed that she could get the loan funded by obtaining $150,000 from various funding sources, such as Don Messenger and his group of investors (Don's Group), and Dunn, Sylk's business partner. Eastgate Capital allegedly "did not offer or have the ability to fund a $10,000,000 loan."

Sylk also introduced Reed to Dunn, who said that he, Sylk, and a business partner from East India were purchasing Genoa Lakes resort in Nevada, and after those negotiations were completed, Reed could open her health spa at the resort. Reed created a business plan, developed project renderings, and hired an attorney to negotiate a

3

contract with Defendants. Thereafter, Reed was told that Genoa Lakes was not for sale. Reed believed there was no business partner from East India or any planned purchase of Genoa Lakes resort.

Sylk next introduced Reed to Messenger. Messenger told her there was no "Don's Group" and he could not provide $150,000 in liquid funds at that time. After Defendants ceased all contact with Reed, in July 2017, Reed contacted the police.

Reed alleges in the first cause of action that Defendants engaged in the unfair and fraudulent business practice of receiving $15,000 for services they knew they could not render. They also made false representations they could put Reed in contact with investors to fund her business venture and undertook an advanced-fee, loan scheme that charged excessive fees.

Reed alleges in the second cause of action for fraud that Defendants falsely told her they could assist her in obtaining a $10 million loan to fund her proposed business venture. They also falsely stated that they were in the process of purchasing Genoa Lakes resort, where Reed could open her health spa. In reliance on these false statements, Reed paid Defendants a $15,000 upfront fee and incurred substantial expenses in furtherance of her business venture. Reed believes Defendants were insolvent based on their requesting and receiving fee waivers from the court in this case. As to the third cause of action for financial elder abuse, Reed alleges that she is over 65 years of age, and Defendants defrauded her out of $15,000.

4

B. *Court Trial*

In April 2021, the trial court conducted a three-day bench trial of Reed's lawsuit against Sylk. During the trial, Reed and Sylk testified and presented documentary evidence.

1.  Reed's Testimony

Reed testified during the trial to the following. After Reed saw Sylk on television running for mayor of La Quinta, she believed he was well connected. Reed called Sylk because she thought he could help her with financing her spa project by putting her in contact with people who could finance her business venture. Sylk told her he knew a wealthy man who could loan her money for her business. Sylk said he could secure a $10 million loan for her but there would be a fee. He suggested she go to the monthly Concerned Citizens of La Quinta meeting, where she met him. Reed also checked out Sylk's website, which stated in detail his accomplishments, including involvement in casinos and other businesses. This was consistent with Sylk's statements to Reed on the phone that he had substantial connections with businessmen who had casinos and destination resorts. Sylk told her he knew extremely wealthy men who wanted to invest in local businesses. He also said he was very experienced in business.

At the Concerned Citizens of La Quinta meeting Reed attended, Sylk told Reed he knew an extremely wealthy man named Swarmi, who was going to purchase with Dunn a resort called Genoa Lakes. At some point, Sylk told Reed the $10 million loan would require she have $150,000 to $300,000 in liquid funds. Reed told Sylk she did not have

5

that amount and that she would need to obtain credit from her home reverse mortgage. Sylk said he would be able to get her the $150,000 to $300,000 required for the loan from Dunn or Messenger (Don's Group).

Sylk and Reed entered into a Contract, which Reed signed on March 8, 2014. Reed believed the purpose of the contract was for Sylk to introduce her to individuals who would enable her to obtain a $10 million loan. The Contract stated that Reed agreed to pay Sylk a $100,000 retainer fee in return for Sylk introducing Reed to funding sources. The contract further stated that, in lieu of this requirement, Sylk agreed to allow Reed to pay him $15,000 as a non-refundable retainer fee and $85,000 at closing of the $10 million loan. Before entering into the Contract, Reed had spoken with Coffin of Eastgate Capital about the $10 million loan. To secure the loan, Eastgate Capital required proof of $300,000 in liquid funds.

On March 9, 2014, Sylk sent an email to Reed stating that Coffin agreed to speak with Sylk and Reed on March 13, 2014. During the conference call, Sylk confirmed that the $10 million loan would be funded through Eastgate Capital, but Reed needed $300,000 in escrow as proof of funds.

On April 3, 2014, Sylk sent Reed an email stating that he was going to introduce her to Messenger, a retired New York investment banker, who had a group who could fund Reed's escrow in four to five weeks. Sylk said he was depositing in escrow the proof of the $300,000 funds. Reed met with Messenger for the purpose of securing the $300,000 escrow funds, which she needed to get the $10 million loan. Messenger told

6

her there was no "Don's Group" and he did not have any money to fund any escrow. Messenger said Sylk did not tell the truth.

Sylk then provided Reed with other contacts who might fund the escrow. He told her that Dunn or Ken (she did not know his last name) could fund it, and also mentioned the Indian investor, Swarmi. Reed asked Sylk in an email dated December 3, 2014, if he was building a casino and hotel. Sylk said he was. It was called Genoa Lakes. He said he and Swarmi were going to purchase land in Nevada and build a casino and performing arts center. Sylk said Reed could build her spa there.

In an email dated August 4, 2014, Sylk told Reed that projects had been delayed and that Don's Group was still waiting to fund Reed's escrow and the other projects. The email further stated that Ken's loan was coming through.

In an email to Reed dated September 23, 2014, Sylk stated that Messenger could fund Reed's $300,000 loan, and Dunn could also possibly do so after his loan got funded in two months. In an email to Reed, Sylk told her that if she provided $150,000 to $300,000 in funds, she would not need anything else for the Eastgate Capital $10 million loan.

In an email to Reed dated November 23, 2014, Sylk noted three percent of the $10 million loan had to be deposited in a mutual escrow account 60 days before closing. Because she could not provide the $300,000, Sylk told her Messenger would provide the $300,000 in funds, but this did not happen. Therefore she never received the $10 million loan. Although Reed knew there was no guarantee she would receive a $10 million loan,

7

she believed it was a certainty or near certainty that Eastgate Capital was going to fund the loan based on Sylk's email that she had been approved for the loan. Reed understood that the loan was conditioned upon Reed having proof of $300,000 in funds, which she worked with Sylk to secure.

On cross-examination, Reed testified that she reviewed and understood the Contract before voluntarily signing it. After talking to Sylk, she paid $3,500 to a professional company to draft her business plan, but the financial part of the plan could not be completed because she did not have the funds to actually buy the property. Reed approached Sylk because she needed assistance with the financial part of the business plan and she thought Sylk would know someone who could help her. Because she believed she would get a $10 million loan, she contacted architects and real estate agents who looked for properties for her.

Reed did not have a real estate license at that time. She had one many years before. However, in a document she provided to Sylk on March 8, 2014, Reed stated she had a real estate license and did a minor amount of selling properties. She also stated she had worked in property management and the rental business since 2007, in La Quinta. She only worked for one year as a real estate agent. She may have retained her license but never used it. Reed's property management experience was limited to renting her own home as a vacation rental. She also rented and was a property manager for a neighbor's property.

Reed testified she understood there was no guarantee in the contract that she would succeed in obtaining the $10 million loan. But she did not understand she might not receive any type of loan. She was told she would get a loan and therefore did not anticipate she would not get any funding. In a June 21, 2014, email, Reed told Sylk that she applied for a $300,000 loan at Wells Fargo Bank and was turned down for the loan.

Reed received an email dated November 3, 2015 (Exh. 129), from Sylk, stating that Eastgate Capital approved Reed for the $10 million loan, conditional upon Reed providing additional information regarding her business plan, which Coffin discussed with Reed on the phone. Reed testified she provided whatever information was requested. Reed did not know what Sylk was talking about in an email in which he stated he got Reed another funding source for a lesser loan of $3 to $4 million loan. Sylk stated he was shocked and surprised Reed turned it down. She consulted an attorney because Sylk was offering her a lot less money.

Reed testified that both Coffin and Sylk told her she would be able to get the $10 million loan, and Sylk told her he would be able to get the $300,000. Coffin did not tell her this until after she signed the Contract. Reed entered into the Contract based on Sylk's representations and paid him $15,000. She also spent $3,500 on a business plan, $1,200 to travel to New Jersey to meet with Messenger, and $2,000 in attorney's fees to consult regarding the Genoa Lakes opportunity.

9

2. Sylk's Testimony

During the trial, Sylk was shown his email to Reed, dated November 4, 2021, regarding the $10 million loan (Exh. 130). Sylk explained that the email did not state Reed was approved for the Eastgate Capital loan. Rather, it stated she was pre-approved. Approval was subject to Reed meeting additional conditions. Sylk denied he ever told Reed she would be able to get a $10 million loan from Eastgate Capital by presenting $300,000 in proof of funds. Sylk's email dated November 23, 2014, stated that he arranged for Messenger to provide the funds ($300,000) required for the Eastgate Capital loan, to be placed in a mutual escrow account about 60 days before the loan closing. After he introduced Reed to the individuals who might assist her with funding, Sylk was unable to contact her for six months after she met with Messenger.

Sylk arranged for securing capital for others, such as Mr. Savwitz and another individual, at no charge. Sylk introduced Mr. Savwitz to contacts to fund three projects. Sylk acknowledged he entered into the Contract with Reed and received $15,000 from her. At trial, Sylk was shown a letter dated March 18, 2014, from Coffin to Sylk, which acknowledged Reed's loan request for $10 million and stated Reed was required to provide collateral toward the loan (Exh. 106). Sylk clarified that the document did not state that Reed would actually receive the loan, and that the loan amount could have been less depending on the cost of the building she purchased. The document stated that Eastgate Capital was very interested in funding the project and was "'able to provide a commercial finance loan of $10 million that will be senior debt and conditioned upon

10

secured and repaid by unconditional and irrevocable cash secured financial guarantee.'" The document further stated that, "'Before continuing the loan process, you will need to submit an authorization to verify letter confirming the availability of the financial guarantee for U.S. dollars 10 million.'" Sylk believed that, before Eastgate Capital would approve the loan, Reed needed verification that the building she intended to purchase with the loan funds was actually for sale. Reed did not have such documentation.

Sylk testified that after he told Messenger about Reed's business plan and Messenger reviewed the plan, Messenger said he would like to speak to Reed and that he could help her with the escrow funding. After Sylk introduced Reed to Messenger by phone, Sylk withdrew from involvement but remained available to provide Reed with advice because he wanted the $10 million loan to go through. This was how he would get his loan commission.

Sylk had two or three other deals similar to the one with Reed, in which he introduced a financer to a borrower, money down was required, and if the loan went through, there was a commission. He also forwarded 25 projects to Messenger and his friends because Sylk could not handle them. He did not receive a fee for those. Sylk received an initial fee, like the $15,000 Reed paid, for four or five deals. He did not receive any compensation at the end for the loans closing. Some of the deals closed but he donated his compensation to the City of Hope hospital or St. John's Child Study Center or some other charity.

11

Sylk was involved in the Genoa Lakes hotel and casino project in Reno, not Las Vegas. He was only involved in obtaining licensing for the casino, which did not take place. He was also involved in a project in Las Vegas, Nevada. Sylk assisted three friends with securing funding and was not compensated. He was not a funder. He only introduced people to potential financiers and investors, which is what he did for Reed. He introduced Reed to funding sources but, based on what Reed told them, they decided not to provide funding. Sylk explained that whether funding is provided is determined by the funding source based on the borrower, their idea, and the likelihood of future prosperity.

Before receiving the $15,000 fee from Reed, Sylk did not inquire as to her assets or income. He did not know what her financial status was because he did not need to know it. Reed led him to believe she was well off. Sylk reviewed her promotional information on properties she was interested in and what her company was going to do. He did not receive a written business plan from her.

Sylk first met Reed at a Concerned Citizens of La Quinta meeting. He never pressured her to enter into the Contract and never told her he would guarantee she would receive a loan from a funding source. Under the Contract he was solely required to introduce her to potential investors. He spent 30 to 40 hours calling nine or 10 funding sources, inquiring whether they were interested in assisting Reed. He contacted Messenger who had a group of six investors. Messenger was an investment banker with 30 years ownership of his own firm on Wall Street. Sylk also contacted Coffin and

arranged to introduce him to Reed. Sylk believed his contacts were potential funding sources for Reed's business plan. Reed did not succeed in obtaining any loans or investments from Coffin or Messenger.

Sylk explained to Reed that no one would lend her $10 million without proof of financial performance and "backup." He also advised her that she had to demonstrate why she needed the requested amount, how the funds would be used, and a timeline so that the financier would create a credit line for her. Sylk told Reed she might also need collateral, and the building she purchased with the borrowed funds could be used as collateral for the loan. Reed told Sylk she would provide what he told her she needed but did not do so. Eventually, after not hearing anything, Sylk asked Messenger to send him a letter regarding the status of Reed's project funding and Messenger's involvement. Sylk denied he ever told Reed she would be able to get the $10 million loan if she provided $300,000 in escrow.

### 3. Trial Ruling

After considering the evidence, briefs, and oral argument, the court issued a final oral decision on April 13, 2021, which was incorporated by reference into the judgment entered on April 23, 2021. The trial court entered judgment in favor of Defendants on each of the three causes of action, and awarded Reed nothing.

The court stated that its decision turned in large part on the credibility of the parties. The court therefore weighed carefully the testimony of both parties. The court stated it found Sylk more credible than Reed. The court concluded that the Contract only

13

obligated Sylk to provide Reed with introductions to potential funding sources. It was unreasonable for Reed to assume that she would receive a $10 million loan without meeting the criteria and conditions of the potential funding sources. The court found that Reed had failed to carry her burden of proof as to her causes of action for (1) violating Business and Professions Code section 17200, (2) fraud, and (3) financial elder abuse. Judgment was therefore entered in favor of Sylk and against Reed.

III.

PAROL EVIDENCE

Reed contends the trial court erred by excluding under the parol evidence rule her testimony regarding statements Sylk made to her when entering into the Contract.

A. *Procedural Background Regarding Exclusion of Testimony*

Sylk testified that she and Reed entered into a Contract. When Reed was asked what Sylk told her when entering into the Contract, Sylk's attorney objected based on the parol evidence rule. The court sustained the objection, ruling that the Contract was a fully integrated contract.

The court and counsel stated the following regarding the objection.

"Q. Is this the contract that you entered into with Robert Sylk?

A. Yes, it is.

Q. What was your – What did Mr. Sylk tell you that – or represent to you in entering into this contract?

14

MR. EDELSTEIN:  I am just going to object to the extent that as to the parol evidence rule this agreement is a fully integrated document, your Honor.

THE COURT:  Please invite my attention to Exhibit 2 which provides it is a fully integrated document, Mr. Edelstein.

MR. EDELSTEIN:  Yes.  At the top of page 2, there is a header on the left that says 'Agreements.'

THE COURT:  Thank you.  One moment.

Mr. Thaler, why isn't this a fully integrated document requiring any requirement, doubt, or understanding, sir?

MR. THALER:  So regarding the terms of the contract, we are not trying to say anything about those, we are just asking Ms. Reed what representations were made entering into it.

THE COURT:  Thank you very much."

The objection is sustained as it relates to the form of the question having been asked."

Later in the trial, Reed's attorney, Mr. Thaler, requested the court to reconsider its ruling excluding Reed's testimony under the parol evidence rule and to allow Reed to testify regarding Sylk's representations made when she entered into the Contract.  The court denied the request and again sustained the objection based on the parol evidence rule.  Mr. Thaler argued that the court should have permitted the testimony under the fraud exception to the parol evidence rule, under Evidence Code section 1856,

15

subdivision (g) and *IIG Wireless Inc. v. Yi* (2018) 22 Cal.App.5th 630. The court stated that it was not going to reconsider or vacate its ruling sustaining the parol evidence objection because the court believed Mr. Edelstein was not eliciting the testimony to establish fraud. The court concluded the fraud exception "[did] not have a direct impact on verifying the terms or conditions of the agreement."

B. *Analysis*

"The parol evidence rule is a rule of substantive law that prevents the introduction of extrinsic evidence to vary, alter, or contradict the terms of a written agreement." (*IIG Wireless, Inc. v. Yi* (2018) 22 Cal.App.5th 630, 640; see also Code Civ. Proc., § 1856, subd. (a).) The parol evidence rule, as codified in Code of Civil Procedure section 1856 and Civil Code section 1625, "provides that when parties enter an integrated written agreement, extrinsic evidence may not be relied upon to alter or add to the terms of the writing." (*Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1174 (*Riverisland*); see also Code Civ. Proc., § 1856, subd. (a).) There is no dispute here that the parties' Contract was integrated. (*Riverisland*, *supra*, 55 Cal.4th at. 1174.)

Code of Civil Procedure section 1856, subdivision (f) provides a broad exception to the parol evidence rule: "Where the validity of the agreement is the fact in dispute, this section does not exclude evidence relevant to that issue." Evidence to prove that the instrument is void or voidable for fraud is admissible. (*Riverisland*, *supra*, 55 Cal.4th at pp. 1174-1175.) This fraud exception is expressly codified in section 1856, subdivision

16

(g), which states: "This section does not exclude other evidence of the circumstances under which the agreement was made . . . to establish . . . fraud." Code of Civil Procedure section 1856 thus "broadly permits evidence relevant to the validity of an agreement and specifically allows evidence of fraud." (*Riverisland*, *supra*, 55 Cal.4th at p. 1175.)

"The operation of the parol evidence rule is a question of law when no evidentiary conflict exists." (*IIG Wireless*, *Inc. v. Yi*, *supra*, 22 Cal.App.5th at p. 640.) "'[W]here the parol evidence is in conflict, the trial court's resolution of that conflict is a question of fact and must be upheld if supported by substantial evidence.' [Citation.]" (*DVD Copy Control Assn., Inc. v. Kaleidescape, Inc.* (2009) 176 Cal.App.4th 697, 713.) Evidence of what Sylk told Reed and whether his statements were false was disputed. Thus, we review the trial court's factual findings on the disputed facts for substantial evidence. Otherwise, the proper standard of review is de novo on the legal issue of whether the fraud exception to the parol evidence rule applies.

Here, Reed alleged in her amended complaint that Sylk made fraudulent representations which she relied on when entering into the Contract. Under the fraud exception to the parol evidence rule, her testimony regarding Sylk's representations, made before Reed signed the Contract, was thus admissible. Nevertheless, any error in the trial court sustaining Sylk's parol evidence objection and renewal of the objection was harmless error.

Although the trial court ruled as inadmissible Reed's testimony regarding Sylk's representations made when entering the Contract, evidence of such representations was nevertheless presented throughout the trial. Reed testified that during her initial phone conversation with Sylk, he told her that he had substantial connections with businessmen who had casinos and destination resorts, and he was very experienced in business. He also said he knew extremely wealthy men who wanted to invest in local businesses. At some point Sylk also told Reed the $10 million loan would require she place in escrow $150,000 to $300,000 in liquid funds, which Sylk said he would be able to secure for her from Dunn or Messenger and his group. Reed testified she was told she would get a loan and therefore did not anticipate not receiving any funding. She was not told that there was a possibility she would not get the loan.

Even assuming the trial court erred in sustaining the parol evidence objection, it is highly unlikely that, had the court permitted the testimony, the trial outcome would have been any different. Such error is normally deemed harmless unless there is a reasonable probability that it affected the trial outcome. (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715; *People v. Watson* (1956) 46 Cal.2d 818, 836; Evid. Code, § 354.) "[A] 'probability' in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*." (*College Hospital Inc. v. Superior Court*, *supra*, at p. 715.)

It is likely that additional testimony by Reed regarding what Sylk told her before they entered into the Contract would not have added anything material, and would not have differed from her trial testimony regarding what Sylk had told her. It is thus not reasonably probable that, had the testimony been permitted, the trial court would have changed its view of Reed's credibility or the trial outcome would have been different. We therefore conclude any error in the trial court sustaining the parol evidence objection was harmless error.

IV.

EXCLUSION OF TESTIMONY REGARDING A $35,000 LOAN

During the trial, Reed's attorney, Mr. Thaler, asked Sylk if in October 2019, he attempted to secure a $35,000 personal loan. Sylk's attorney objected on relevancy grounds, and the court sustained the objection. Reed contends the trial court abused its discretion in excluding Sylk's testimony because it was impeachment evidence relevant to his ability to secure financing. We disagree.

"No evidence is admissible except relevant evidence" (Evid. Code, § 350), and "[e]xcept as otherwise provided by statute, all relevant evidence is admissible" (Evid. Code, § 351). Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Testimony impeaching an opposing party's credibility is admissible when relevant. (*Martinez v. Department of Transportation* (2015) 238 Cal.App.4th 559, 567, fn. 6.) "We apply the abuse of discretion standard when reviewing the trial court's

19

rulings on evidentiary objections." (*Twenty-Nine Palms Enterprises Corp. v. Bardos* (2012) 210 Cal.App.4th 1435, 1447.)

Reed argues testimony by Sylk regarding his failed attempt to secure a $35,000 personal loan was relevant to demonstrating that, contrary to his representations to Reed, he was unable to secure financing for her prospective business venture. We disagree. Evidence that Sylk did not succeed in securing a personal loan was irrelevant to the issues in the case nor did it shed light on his credibility. Reed was attempting to show that Sylk made misleading, fraudulent misrepresentations to her, which caused her to sign the Contract, but those misrepresentations were not regarding Sylk's personal financial circumstances or assets, which were irrelevant. His credibility in this regard, including regarding any attempt to secure a personal loan, was thus irrelevant. Although Sylk told Reed he would help her secure financing for her business venture, there is no evidence that he told her he would personally finance her business or lend her any money. The evidence only shows that Sylk offered to provide Reed with contacts who might assist her with financing.

We therefore conclude any evidence of Sylk's personal financial situation or wealth, including any inability to secure a personal loan, was irrelevant to Sylk's credibility for purposes of the instant case. The trial court thus properly excluded the evidence because it did not qualify as relevant impeachment evidence.

Even if there was error in excluding the testimony, Reed has failed to meet her burden of demonstrating it was prejudicial error. (*Citizens for Open Government v. City of Lodi* (2012) 205 Cal.App.4th 296, 308; *Cassium v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800-802.) Evidence Code section 354 provides that "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless the court . . . is of the opinion that the error or errors complained of resulted in a miscarriage of justice and it appears of record that: [¶] (a) The substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means; [¶] (b) The rulings of the court made compliance with subdivision (a) futile; or [¶] (c) The evidence was sought by questions asked during cross-examination or recross-examination."

Reed has not established it is reasonably probable that excluding irrelevant testimony regarding Sylk's personal loan application would have made any difference in the trial outcome. (Evid. Code, § 354; *Cassium v. Allstate Ins. Co.*, *supra*, 33 Cal.4th at pp. 800-802.) Substantial evidence demonstrates that Reed was aware when she entered into the Contract that Sylk would not be providing financing and was only agreeing to provide her with contacts who might provide financial assistance. Sylk's personal wealth was therefore not relevant to Reed's claims of fraud, fraudulent business practices, or elder abuse. There was also overwhelming evidence that Reed knew when she signed the Contract that there was no guarantee she would receive a $10 million loan or other financial assistance. The record is also clear that the trial court found Sylk more credible

21

than Reed.  It is not reasonably probable that evidence that he was unable to secure a personal $35,000 loan would have changed the court's credibility finding.  Reed therefore has failed to demonstrate reversible, prejudicial error.

V.

DISPOSITION

The judgment is affirmed.  Sylk is awarded his costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
Acting P. J.

We concur:

SLOUGH
J.

RAPHAEL
J.